1  **JOHN G. BURGEE, ESQ. (State Bar No. 132129)**
   **BURGEE & ABRAMOFF P.C.**
2  20501 Ventura Boulevard, Suite 262
   Woodland Hills, California 91364
3  (818) 264-7575

4  Attorneys for Plaintiff
   THEATRICAL ARTS INTERNATIONAL, INC.

FILED-Central District
SUPERIOR COURT
SAN BERNARDINO COUNTY

AUG 10 2006

By *Stephanie Chandler*
                    **Deputy**

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF SAN BERNARDINO

| | |
|---|---|
| THEATRICAL ARTS INTERNATIONAL, INC., a California corporation, | CASE NO. SCVSS 138221 |
| Plaintiff, | **DECLARATIONS OF JOSEPH HENSON AND JOHN G. BURGEE IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |
| vs. | |
| THE MAMMA MIA! USA TOUR 2 LIMITED PARTNERSHIP, a New York limited partnership, and DOES 1 through 50, inclusive, | |
| Defendants. | Date:  August 10, 2006<br>Time:  8:30 a.m.<br>Dept.:  C6 |

Trial Date:  None set.

### DECLARATION OF JOSEPH HENSON

I, Joseph Henson, declare:

1.      I am the President of Plaintiff THEATRICAL ARTS INTERNATIONAL, INC., a California corporation ("TAI"). TAI's principal place of business is located in San Bernardino, California. The facts stated herein are personally known to me, and if called to testify as a witness, I can and will testify competently thereto.

2.      This declaration is made in support of TAI's application for a temporary restraining order and order to show cause regarding the issuance of a preliminary injunction.

3.      TAI is a theater production company which stages live theater productions at various venues in Southern California including the California Theater located in San

1

DECLARATIONS IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION

1  Bernardino. Defendant THE MAMMA MIA! USA TOUR 2 LIMITED PARTNERSHIP, a New

2  York limited partnership ("Mamma Mia!") is the producer of a theatrical touring company for the

3  musical production "MAMMA MIA!" (the "Show").

4      4.      In 2003, I had TAI's agent book the Show to play at the California Theater in

5  February 2006. At the time, Mamma Mia! issued "deal points" that TAI was to operate under.

6  As President of TAI, I was the sole person making decisions regarding the deal for the Show.

7  There was no discussion as to arbitration of disputes or selecting New York as the applicable law

8  or venue for any disputes. The "deal points" that I agreed to on behalf of TAI therefore did not

9  include an agreement as to choice of governing law, the submission of disputes to arbitration or

10  the place of any arbitration.

11      5.      In January 2006, I first received a formal written contract for the Show from

12  Mamma Mia! There were many terms in the written contract that had not been discussed or

13  agreed including the issue of arbitration, selection of governing law or the venue for arbitration.

14  The proposed contract had a number of terms that were unacceptable to TAI and did not match

15  agreed deal points. In the spirit of cooperation, TAI was willing to accept some of the new terms

16  provided that other terms were corrected to conform to the deal I had made with Mamma Mia!

17  Most importantly, the proposed contract omitted the season subscriber discount in the ticket

18  pricing schedule. This was pricing that had been established over a year and a half prior to the

19  receipt of this proposed contract. I therefore interlineated TAI's changes to terms to the proposed

20  contract which included the addition of a schedule for subscriber ticket pricing to conform to the

21  agreed deal points. Even though TAI had not agreed to the arbitration, choice of law and venue

22  provisions of the proposed contract, I did not strike those provisions as a gesture of good faith

23  provided the interlineations I did make would be accepted by Mamma Mia! I would not have

24  agreed to these provisions if my corrections of the other terms of the proposed contract, including

25  most importantly the confirmation of the subscriber's discount ticket pricing, were not accepted.

26      6.      TAI returned the proposed contract with its interlineations to Mamma Mia! in

27  early February 2006. I was involved in discussions with Mamma Mia! through our respective

28  agents, concerning TAI's changes to the contract. The issues raised by my changes to the

2

DECLARATIONS IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION

proposed contract were never raised as a point of litigation from Mamma Mia! Nonetheless, on February 16, 2006, I sent an executed copy of the proposed contract subject to the interlineated terms to Mamma Mia!, a true and correct copy of which is attached hereto as Exhibit A. There were no further discussions regarding the terms of the proposed contract and Mamma Mia! never returned a fully executed version of the proposed agreement.

7.    The Show was presented as scheduled during the week of February 21, 2006. As agreed, TAI paid Mamma Mia! the guaranteed fee for the Show of $375,000 (less withheld taxes).

8.    Three days into performance, Mamma Mia! contacted TAI alleging that more than an additional $100,000 were owing from the presentation of the Show. I disputed this claim. To support its claim, Mamma Mia!'s counsel sent a fully executed version of the proposed contract to TAI's counsel on March 22, 2006, a true and correct copy of which is attached hereto as Exhibit B. However, the fully executed version of the proposed contract returned by Mamma Mia! contained changes to the interlineations that I had made. Mamma Mia! made their own interlineations and changes to the proposed contract after receiving the signed, interlineated version from TAI, and then executed the proposed contract. Among other things, Mamma Mia! struck out the schedule of subscriber ticket pricing that I had added, agency sales commissions and subscriber sales commissions. I never agreed to Mamma Mia!'s interlineations or modifications of the proposed contract nor did I know about such changes to the document until late March 2006. If I had prior knowledge of these changes, TAI would have not performed this production.

9.    TAI is a small company that conduct business only in Southern California. All dealings that I had in connection with the Show were conducted telephonically from my office in San Bernardino and involved TAI's agent whose office is in Los Angeles. The Show was staged

//

//

//

//

3

1   by TAI only in San Bernardino.  TAI has no history with New York attorneys and it is a hardship

2   for TAI to defend litigation in New York.

3

4          I declare under penalty of perjury under the laws of the State of California, that the

5   foregoing is true and correct.  Executed on August 9, 2006, at San Bernardino, California.

6

7                                                          _____

8                                                          JOSEPH HENSON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

HENSON DECLARATION IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION

1          **DECLARATION OF JOHN G. BURGEE**

2          I, John G. Burgee, declare:

3          1.      I am a principal of Burgee & Abramoff Professional Corporation, attorneys of

4   record for Plaintiff THEATRICAL ARTS INTERNATIONAL, INC. ("TAI") in this action. The

5   facts stated herein are personally known to me and if called as a witness, I can and will

6   competently testify thereto.

7          2.      This declaration is made in support of TAI's application for a temporary

8   restraining order and order to show cause regarding the issuance of a preliminary injunction.

9          3.      I became involved in this matter when Mamma Mia! persisted with its claim for

10  additional compensation based upon its version of the proposed contract. Mamma Mia!'s

11  counsel threatened to proceed with arbitration pursuant to the proposed agreement if the matter

12  was not resolved. I corresponded with Mamma Mia!'s counsel, objecting that the proffered

13  written contract was not viable since Mamma Mia! did not accept the contract as proposed by

14  TAI with its interlineations and made materials changes to the document without TAI's

15  knowledge or consent. Based upon the threat of arbitration, I prepared the Complaint which was

16  filed on May 31, 2006, in order to contest the validity of the written document as a valid contract.

17         4.      On June 27, 2006, Mamma Mia! commenced arbitration with the American

18  Arbitration Association ("AAA"). A true and correct copy of the Demand for Arbitration

19  without exhibits is attached hereto as Exhibit C. I participated under protect in a preliminary

20  conference held by the AAA on July 21, 2006. I voiced an objection to the arbitration and stated

21  that my client would proceed with this action to litigate its objection. Since that time, the AAA

22  has served a list of proposed arbitrators and I am required to respond next week lest my client's

23  rights be prejudiced. This action was served on Mamma Mia! on August 2, 2006. A true and

24  correct copy of the proof of service is attached hereto as Exhibit D.

25         5.      The next day, Mamma Mia! gave notice that it was commencing an action in New

26  York and seeking an immediate restraining order to enjoin this action and compel arbitration. A

27  true and correct copy of the letter for Mamma Mia!'s counsel and the Verified Petition filed to

28  commence the action are attached hereto collectively as Exhibit E. Less than 24 hours notice

5

**DECLARATIONS IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION**

1   was given of the appearance. Although Mamma Mia! appeared in court in New York on the

2   morning of August 4, 2006, the court did not issue temporary restraining orders. The court

3   issued an order to show cause with a return date of August 10, 2006, a true and correct copy of

4   which is attached hereto as Exhibit F.

5        6.    I gave notice of this *ex parte* Application on August 9, 2006, at 9:50 a.m. I first

6   telephoned Devin Keudell who is Mamma Mia!'s general manager since Mamma Mia! is

7   unrepresented in this action. Mr. Keudell was unavailable. I therefore left a detailed voice mail

8   message for him, stating the date, time, place and nature of this Application. I further called

9   Mamma Mia!'s New York counsel, Al Daniel, as a courtesy. Mr. Daniel was not in. I asked the

10   receptionist what the best way was to leave a message for Mr. Daniel since I was giving him

11   notice of an *ex parte* appearance. She said that I should leave him a voice mail message. I

12   therefore left Mr. Daniel a detailed voice mail message, stating the date, time, place and nature of

13   this Application. I later received an email from Mr. Daniel stating that he had receive the

14   message and my *ex parte* notice. My two telephone calls were completed by 9:58 a.m. on August

15   9, 2006.

16        7.    With some difficulty, I located an attorney to assist me in New York. He advised

17   me that Mamma Mia!'a attorneys went into the New York court on the afternoon of August 9,

18   2006, without any notice, to ask the judge for emergency relief. No relief was granted. I am told

19   by the New York attorney helping me with this matter that in a later conversation, Mamma

20   Mia!'s attorney stated that he would continue to pursue emergency relief on the morning of

21   August 10, 2006, prior to the hearing of this Application.

22

23        I declare under penalty of perjury under the laws of the State of California that the

24   foregoing is true and correct. Executed on August 10, 2006, at Woodland Hills, California.

25

26

27                      JOHN O. BURGEE

28

DECLARATIONS IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION

# BOOKING AGREEMENT

145 West 45th Street
8th Floor
New York, NY
10036

212-869-9280
Fax
212-869-3028

Agreement made this 23RD day of DECEMBER, 2005 by and between

**MAMMA MIA USA TOUR 2, LP**
(the "Producer")

and **THEATRICAL ARTS INTERNATIONAL**
located at **C/O HARMONY ARTISTS**
**8455 BEVERLY BLVD., SUITE 400**
**LOS ANGELES, CA 90048**
Contact: Joseph Henson Phone: (909)885-5152 Fax: 1-909-885-8672
(the "Presenter")

It is mutually agreed by and between Producer and Presenter as follows:

1. Presenter desires to present and Producer agrees to provide a theatrical touring company of

**MAMMA MIA!** (the "Attraction") in **SAN BERNARDINO, CA** (the "City")
for the following performances:

**FEBRUARY 21 - 26, 2006 (8 Performances)**
**TUESDAY - SATURDAY EVES @ 8:00PM**
**SATURDAY & SUNDAY MATS @ 2:00PM**
**SUNDAY EVE @ 7:00PM**
(the "Performances")

2. Presenter agrees to engage, and shall have the exclusive right to present, the Attraction in the City for the performances listed above, and agrees to furnish the

**CALIFORNIA THEATRE** (the "Theatre") located at
**562 W. 4TH STREET**
**SAN BERNARDINO, CA 92402**
with a seating capacity of: **1,578.**

The seating capacity listed above includes any and all seats available for occupancy, including any corporate and/or sponsor seats and viewing rooms.

Presenter warrants that it owns or has a valid and effective lease for the Theater for the period from: 8:00 AM on Monday, February 20, 2005 (the exact day and time of a prior spotting call shall be scheduled by Producer) until **Midnight on Sunday, February 26, 2006** or until the Load-out is completed, whichever is later. (the "Term").


THE BOOKING GROUP



MAMMA MIA! – SAN BERNARDINO, CA

3.    Definition of Net Adjusted Gross Weekly Box Office Receipts (NAGWBOR)

Net Adjusted Gross Weekly Box Office Receipts (hereinafter "NAGWBOR") shall be defined for purposes
of this Agreement as all Gross Weekly Box Office Receipts (hereinafter "GWBOR") from any source
whatsoever from the sale of tickets at the ticket prices as set forth on the attached Schedule "A" (Ticket
Prices and Gross Potential) to performances of the Attraction hereunder less only as follows:

a) The charges set forth below in addition to any other reasonable service or postage and handling
surcharges paid by ticket purchasers over and above the ticket prices as noted below:

Restoration Charge                                                      N/A

The GWBOR will not be subject to surcharges other than those described above.
All surcharges must be listed herein or must be mutually agreed to in writing by both parties in a
separate addendum of this agreement; if such a surcharge is not disclosed and mutually agreed
upon, it will not be allowed.

b) Any discounts as set forth on the attached Schedule "A2" (Ticket Discounts and Commissions), or
otherwise agreed to in writing.  Group sales discounts shall only apply to groups that attend the
same performance, unless approved in writing in advance.

c)  Any tax or taxes, imposed on the sale of tickets as set forth on the attached Schedule "A2", and
actually collected and paid to governmental tax authorities.  The tax or taxes shall be calculated on
the GWBOR only after the discounts and charges set forth in sub-paragraphs 3. a) & b) above have
been deducted. Presenter agrees to provide documentation and proof of payment of these taxes.
Presenter warrants that the GWBOR shall not be subject to taxes other than those specifically
indicated.   State 2 to 6% must be allowed or have waiver . ✱

d)  The ticketing commissions only as set forth on the attached Schedule "A2".  These commissions
shall be calculated on the GWBOR only after the discounts, charges and taxes set forth in sub-
paragraphs 3. a), b) and c) above have been deducted.  Presenter warrants that each ticket sold shall
not be subject to more than one of the ticketing commissions set forth on Schedule A2 (for example,
Credit Card Commissions cannot be taken on Subscription and Group ticket sales).  Presenter
additionally warrants that the GWBOR shall not be subject to ticketing commissions other than those
specifically listed on Schedule A2.  Presenter shall not be obligated to furnish substantiation or
documentation for the commission rates set forth on Schedule A2, but shall provide bona fide
documentation (for example, a signed group contract, etc.) estimating the amount of groups,
phone sales, remote sales and subscription tickets sold and method of payment.

## MAMMA MIA! – SAN BERNARDINO, CA

4.    Compensation to Producer

A. The NAGWBOR as defined in paragraph 3. above for the performances hereunder shall be paid and distributed as follows:

1)      Presenter agrees to pay Producer a weekly Guarantee (based on an eight performance week) of: THREE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($375,000.00) PER WEEK, ~~payable by 2PM the day of the first performance of each playing week hereunder~~ (No deposit is required for this engagement), plus: (It is understood that Presenter shall pay any and all Local Expenses (as described herein) and that the Presenter shall not be obligated to furnish substantiation or documentation for Presenter's Local Fixed Expenses. Presenter agrees to pay Producer the Guarantee as set forth above, irrespective of the actual gross box office receipts derived from the sales of tickets to the performances hereunder, without any deduction, charge, set-off or withholding of any kind, except as specifically provided for herein). The guarantee and fixed expenses shall be pro-rated accordingly for any week with less than eight performances.  _Upon Receipt of Settlement + Check from Tickets Master._

2)      Producer shall receive overages of EIGHTY PERCENT (80%) of the weekly NAGWBOR remaining after the payments described in sub-paragraphs 2) a. and b. below payable no later than Intermission of the final performance hereunder:

    a. The Guarantee set forth above, and after:

    b. The Presenter's Local Expenses as follows:

        1) The weekly "Local Fixed" expenses in the maximum amount(s) set forth on the attached Schedule "B", it being understood that Presenter shall not be obligated to furnish substantiation or documentation for Presenter's weekly "Local Fixed" expenses.

        2) The actual weekly "Local Documented" expenses with estimates as set forth on the attached Schedule "B", it being understood that Presenter shall furnish complete, accurate and detailed substantiation and documentation of Presenter's weekly "Local Documented" expenses with documented invoices and proof of payment, subject to Producer's approval, not to be unreasonably withheld.

        The Presenter's Local Expenses shall be reimbursed only as set forth on the attached Schedule "B" as Presenter's "Local Fixed" and "Local Documented" expenses (and as those expenses are further defined herein) and only for items that fall within the specific categories for which an estimated dollar value is shown. The specific categories and amounts of Presenter's Local Expenses shall be subject to Producer's prior written approval, and once approved shall be attached and made part of this agreement.

B. All payments due hereunder shall be made by company check or wire transfer payable to: MAMMA MIA USA TOUR 2, LP. Any advance payments shall be sent to MAMMA MIA USA TOUR 2, LP, c/o The Booking Group, 145 West 45th Street, 8th Fl., New York, NY 10036. For any Company bills due after the close of the engagement, please mail to:   MAMMA MIA USA TOUR 2, LP, c/o Nina Lannan Associates, 1450 Broadway, Ste. 2011, New York, NY 10018.

FEDERAL ID #: 13-4198436

5.    Production Information

Producer shall furnish the following elements of the Attraction which shall be fully rehearsed and directed and with a complete physical production as specifically set forth below.

Page 3

## MAMMA MIA! - SAN BERNARDINO, CA

a) All salaries, fees, and per diem expenses of Producer's employees, including all members of the cast, stage managers, traveling stagehands, traveling wardrobe personnel, traveling musicians including the musical director, traveling hairdressers, national press representative and/or traveling press agent, general manager and company manager.

b) All royalties and fees payable to the directors, designers, and Producers and the authors and owners of the performing rights of the Attraction.

c) Producer's general and administrative expenses, including but not limited to legal and accounting fees, office charges, booking fees and commissions, telephone, xerox and messenger charges, insurance premiums on Producer's policies insuring Producer's equipment and personnel.

d) All costs associated with the design, building, and rental of any and all elements of the physical production including sets, props, costumes and wigs, and all rentals on equipment furnished by the Producer.

6.    Presenter Personnel, Services & Facility Requirements

Presenter will make all necessary local arrangements with third parties and provide the local services and facilities and local personnel (including all salaries, fees, and any and all payroll taxes and fringe benefits applicable to all local personnel) as required by Producer to present a successful run of the Attraction at the Theatre in the City in accordance with theatrical industry custom and practice. It is specifically understood that the Presenter shall be solely liable for and shall pay all "Local Expenses" directly, except as otherwise agreed to herein, of every kind in connection with the presentation of the Attraction, as detailed in the attached Technical Rider and Schedule B.

a) Presenter shall furnish, and provide for the maintenance and cleaning of the theatre for the Term of this Agreement at its own expense. Presenter agrees that there shall be no discrimination practiced in the Theatre on the basis of race, color, age, creed, sex, disability or sexual orientation against any performer or patron as to admission or seating in the Theatre. Presenter shall enter into a theatre lease agreement (the "Theatre Lease") with the owner of the Theatre.

1. The Theatre Lease shall provide that the owner will furnish the Theatre at the start of the load-in clean, electrified, fully staffed, free and clear of any bandshells, motion picture screens or other impediments, properly licensed and with such heat and/or air-conditioning as is required for comfort, for the exclusive and sole use of the Producer for the Term of this Agreement.

2. The licensed premises shall include the Theatre (including but not limited to audience area and seats, stage and backstage areas, orchestra pit areas, existing permanently installed sound and lighting equipment, box booms, balcony rail hookups, house sound system, backstage paging system (if any), dressing rooms near the stage with chairs, lights, mirrors, make-up tables, hot and cold running water, hanging facilities for costumes, accessible lavatory facilities and musicians' lounge if available) in good condition and in accordance with the provisions of this Agreement, the appropriate governmental laws, licenses and regulations and in accordance with the Actors' Equity Safe and Sanitary Code. The Theatre Lease must meet all terms and conditions as specified in the attached technical rider. The Theatre Lease must also provide for the Theatre to furnish an electrical power supply separate from the Theatre's house lighting and other electrical systems adequate for the operation of Producer's sound, lighting and automation equipment as set forth in the attached Technical Rider.

3. During the Term, Producer's employees and representatives shall have full access to all areas of the Theatre as set forth above, but except as expressly provided herein, the Producer shall have no control over the actual operation of the theatre or over any operating personnel employed or utilized by Presenter. The control of all entrances and exits shall be solely exercisable by the Presenter and Presenter shall furnish adequate security for the observance of the following restrictions: No one shall enter any stage areas or

## MAMMA MIA! – SAN BERNARDINO, CA

dressing rooms or audience areas except persons engaged by the Producer, the Presenter or the Theatre owner in connection with the operation of the Theatre, and, in the case of the audience areas, except members of the audience holding tickets for admission.

4. Notwithstanding the fact that the Theatre Lease may include provisions for the facilities, services and personnel required for the presentation of the Attraction, the Presenter shall nonetheless bear primary responsibility for insuring that the provisions of this Agreement are fully complied with by the Theatre.

b) If any of the above facilities, services and personnel required for the presentation of the Attraction are not directly furnished by the Theatre in accordance with the provisions of the Theatre Lease, Presenter shall nonetheless furnish the required facilities, services and personnel and shall directly pay all local expenses and costs incurred in connection therewith including but not limited to the following:

1. All local preliminary and weekly operating general and administrative costs of the Presenter and the Theatre for the presentation of the Attraction including all costs associated with subscription, group and single ticket advertising and ticket sales, pre-approved local press agent and Presenter staff, Theatre cleaning and customary and required maintenance and repairs, the preliminary and weekly operating costs of the box office including box office personnel, and subscription, telephone, group sales, and mail order sales clerks and staff, front of house personnel, security personnel, and all other personnel required to be engaged locally (plus applicable taxes and fringe benefits).

2. All preliminary theatre expenses including salaries of local stagehands and/or housemen (plus applicable taxes and fringe benefits) for the spotting of lines and electrical pre-hang and preparation, clearing or "stripping" and restore of all scenery drops, drapes, lighting equipment, motion picture screens, orchestra shells and "clouds" and any extraneous equipment, materials and props from the stage floor and stage wings, lines and fly system, electrical system, orchestra pit area, auditorium and dressing rooms and in all ways technically prepared for the load-in and technical and orchestra readings and rehearsals, all as required by Producer, and/or set forth in the attached Technical Rider, in order to properly present the show. Presenter agrees to provide for any necessary parking and/or parking permits and/or licenses (and will notify Producer or complete on the Producer's behalf any applications necessary) and to have all truck approaches to the Theatre loading dock free and clear of other vehicles or any extraneous materials so as to permit direct and unhindered approach of Producer's trucks.

3. All costs of load-in and load-out including salaries of local stagehands, wardrobe attendants, housemen, security personnel, stage door personnel, teamsters and loaders for the Producer's trucks (plus applicable taxes and fringe benefits), and any equipment rentals as required by Producer, the repacking of empty crates into the Producer's trucks if Theatre cannot provide adequate storage, any restoration to Theatre that may be required to Theatre and any catering required by applicable rules and regulations or in the event of a "round-the-clock" load-in.

4. All expenses associated with providing local musicians including the local musical contractor as set forth in the attached Technical Rider, or any additional musicians or "walkers" who are required to be hired pursuant to local musicians union rules or regulations.

5. All local costs related to work calls and any technical rehearsal prior to the opening night of the engagement as required by the Producer and/or set forth in the attached Technical Rider (including orchestra reading and rehearsals plus orchestra sound checks, as scheduled by the Production Stage Manager or Musical Director, technical and stage, sound and lighting checks and/or rehearsals).

6. All local costs related to performances of the Attraction to include sound and lighting checks commencing one hour before opening of the house, and all pre-sets, one hour of wardrobe pre-set, wardrobe and hair daywork (up to 64 hours per performance week), the salaries of local stagehands, wardrobe & hair attendants (including dressers), housemen, local musicians, ADA personnel (and expenses as necessary), security personnel, stage door personnel, ushers, ticket takers, house manager, technical director (if included

Page 5

## MAMMA MIA! – SAN BERNARDINO, CA

in yellow card), porters, cleaners, janitors, matrons, and other theatre personnel plus applicable documented taxes and fringe benefits.

7. All costs associated with providing all elements, materials and equipment and complying with all the terms of the attached Technical Rider necessary to accommodate the physical demands of the production.

8. Presenter agrees to adhere to and abide by the applicable rules, regulations and requirements of all unions having jurisdiction over the performances hereunder and all personnel provided by Theatre or Presenter shall be members, in good standing, of any union having jurisdiction in the state in which performances of the Attraction hereunder are to be presented, and shall be subject to Producer's supervision during the load-in, rehearsal calls, performances, and load-out of the Attraction. Producer's complaints, if any, concerning personnel furnished by Presenter shall be submitted to Presenter, and both parties shall use their best efforts to resolve any conflict.

9. Presenter shall furnish to Producer not later than Eight (8) weeks prior to the first performance hereunder, copies of all local collective bargaining agreements, union rules and regulations, salary scales and rates and union fringe benefits applicable to the required local personnel for the performances hereunder.

10.    Presenter agrees that all local personnel shall be subject to Producer's supervision during load-in, rehearsals, work calls, immediately before, after and during all performances and load-out and shall comply with technical and production requirements as specified by the Producer but who shall in no event be deemed employees of Producer.

11.    Presenter shall, at its own expense, provide or arrange for Theatre to provide a printed program to distribute free to each and every member of the audience for all performances hereunder. Producer shall provide the copy for the program no later than Four (4) weeks prior to the first performance hereunder. Presenter agrees to print the program in its entirety and exactly in the format provided by Producer. Presenter shall be liable for any failure to comply with this provision with the exception of any casual or inadvertent omission(s) or alteration(s), which shall promptly be remedied by Presenter.

12. Presenter agrees that if any of the requirements or conditions of this Paragraph 6 or the Technical Rider have not been duly met, fulfilled or complied with by Presenter at the times provided for, or in the event the Presenter fails to provide the personnel required by Producer, then Producer shall have the right to do what the Presenter has failed to do and Presenter agrees that the Producer's representative may, at the Presenter's sole expense, provide for such requirements or conditions and/or may engage at the Presenter's sole expense those additional personnel required at reasonable and customary rates.

13. **Telephone lines shall be provided by Presenter, and paid for as a Local Documented Expense.**

  Concessions and Souvenir Programs

Immediately prior to and after each performance and during intermission, Producer shall have the sole right to sell souvenir programs and show merchandise supplied by the Producer in the theater lobby, subject to the theater concessionaire's requirements, if any.   Producer shall negotiate directly with the Theater concessionaire to determine merchandising commissions.  CALIFORNIA THEATRE CONCESSION FEE IS 20%

  Advertising and Publicity

a) Producer agrees to furnish a complete press kit plus a reasonable quantity of heralds and window cards. Presenter agrees to follow the Producer's instructions and properly imprint, distribute and display all materials without alteration. Producer also agrees to furnish, if available, prerecorded television and radio commercials.  Presenter agrees to use only the press materials, heralds, window cards, photographs, television and radio commercials furnished by Producer in accordance with Producer's style guide which shall be furnished with press materials. Presenter agrees that all such materials and commercials shall be

Page 6

## MAMMA MIA! – SAN BERNARDINO, CA

used only for the purpose of advertising the Attraction and shall be returned to the Producer immediately upon completion of the engagement. Presenter agrees that Producer shall have the right to approve the contents of all advertising and publicity materials. Presenter shall contact Producer for approval of any advertising and/or publicity materials Presenter wishes to modify or alter (with the exception of localization (theatre name, local sponsor, ticket information, etc)). Presenter agrees to indemnify Producer by reason of Presenter's breach of the provisions of this paragraph. In the event Presenter alters, omits, adds to or does not print any of the billing or other program copy or other copy as provided by the Producer, Presenter shall be liable for any penalty or liability imposed upon the Producer by all third parties including Actors' Equity Association provided proper notification of such breach has been received by Presenter and remedy of such breach shall be at Presenter's sole expense; if presenter been given reasonable time to resolve the issue.

b) Presenter agrees to pay for all advertising expenses, and publicity services of any type required for the proper fulfillment of the engagement (including Advertising Agency commissions). Advertising commissions are limited to a maximum of Twelve Percent (12%) on Print advertising and Ten Percent (10%) on Electronic advertising. Such commission will be a local documented expense; it will be amortized over the playing weeks. Not later than eight weeks prior to the first performance but in no event less than four (4) weeks prior to the desired on sale date, Presenter agrees to submit the advertising budget, advertising plan, and the advertising schedule for Producer's approval. Advertising expenses will be reimbursed only for documented print, radio, outdoor, and television advertising expenses for single ticket sales (including production costs). No other expenses (including but not limited to any costs whatsoever for advertising and/or direct mail for subscription and group sales solicitation, web-site hosting fee, program, press agent fees and expenses, etc.) shall be considered allowable advertising expenses. All such expenses must be based on actual cost and be fully documented, with bills (affidavits) from stations for all radio and television advertising, and bills from all print media and others, and tear sheets for print advertising. All bills must be submitted by Friday of each performance week herein at noon.
                SUNDAY

c) Presenter agrees to consult with, and obtain approval from, the Producer (or Producer's representative) for all media buys, trades and all facets relative to the proper promotion of the Attraction. Producer's logo, art and/or lyrics for the Attraction may not be used for publicity without prior written approval of Producer.

d) Press requests for appearances and interviews of any member of the company must be approved by Producer (or Producer's representative). Any union payments, if required, for said appearances shall be paid by Presenter.

e) Presenter will comply with all advertising and billing requirements of Producer. Trade advertising shall be disclosed and pre-approved by Producer. All local sponsorship requests must be disclosed upon the submission of ticket scales. Producer has the right of approval over any sponsorship requirement that directly affects the Attraction (ticket requirements, lobby displays, inclusion in advertising, etc.), and such approval shall not be unreasonably withheld with prior disclosure. Producer shall also disclose any national sponsorships that may affect the local market (ticket requirements, inclusion in advertising, product exclusivity, etc.) in a timely manner.

f) Presenter agrees that no other Attraction shall have more favorable advertising placement or larger advertising space inside or outside the Venue (including Venue's marquee) during the full run of the engagement for this Attraction (including but not limited to any dark time prior to opening of this engagement).

9.    Taping of Show

Presenter agrees to prevent the broadcasting, recording, transmission, photographing, or any other transmission or reproduction of any rehearsal or performance(s) or any part thereof by any means or media now or hereafter known including but not limited to audio, visual, or audio-visual means except for authorized opening night news footage. Presenter further agrees the Attraction shall be presented without

Page 7

## MAMMA MIA! – SAN BERNARDINO, CA

( any pre-show activities or ceremonies and/or any other performer or other Attractions being presented )
  herewith.

### 10.  Price Scale, Accounting and Ticket Sales

a) From the date tickets go on sale through the close of the run, by 2:00PM (EST) each business day, the daily box office wrap must be called or faxed to The Booking Group: Phone (212) 869-9280; Facsimile: (212) 869-3028.

b) Producer shall be supplied with a manifest and seating diagram (with actual numbered seats and location of all seats to be made available for sale). Presenter will arrange and provide facilities for the sale of tickets to all scheduled performances through box office, outlets, telephones, subscriptions, group mail order and credit cards. Presenter warrants that there are not any seats which are not listed on the manifest that have been sold or are available for sale to any patrons in any form whatsoever, including but not limited to corporate suites or boxes or seats that have been given to a sponsor in exchange for sponsorship dollars except as otherwise agreed to in writing.

c) Presenter shall keep and maintain detailed, accurate books and records corresponding to the sale of all tickets and gross receipts hereunder, expenses properly chargeable to Producer hereunder, and expenses chargeable to Presenter hereunder (including documented advertising expenses). Producer's representative shall have access to and the right to make copies of such records at all times and shall have free access to the box office during all regular business hours during the Term.

d) The receipts of each performance shall be ascertained by the statement of the sales of the box office provided to Producer no later than intermission of each performance hereunder and all other points of sale and may be verified for each and every performance by the Producer, if desired, by the count of the tickets taken at the door and placed in a secure box. Except for members of the press and other media which shall be limited to opening night (and must be approved by Producer's Representative), neither Presenter nor Producer shall furnish free tickets or admission to the performances unless mutually agreed upon, such approval not to be unreasonably withheld. All discounted tickets must be stamped or clearly marked with the actual price. All complimentary tickets must be stamped or clearly marked complimentary or shall indicate a zero ($00.00) ticket price. Presenter shall use best efforts to prevent misuse of tickets; tickets may not be sold for more than face value.
▷ THESE TERMS APPLIED TRADES ARE BOTH TOTAL OVER RUN.

### 11.  Producer House Seats and Complimentary Tickets

                    10                                                                          7
Presenter agrees to hold 25 pairs of house seats for Producer's purchase for each performance in rows 10 - 15 of the center section of the orchestra. Such seats not specifically allocated by the Producer or his representative forty-eight (48) hours prior to the performance may he released with the provision that two (2) pairs of house seats be held until two (2) hours prior to performance. House seat orders shall be exempt from service charges in excess of normal facility fees (where applicable).

All tickets held off-sale for any reason by Presenter shall be disclosed and approved by Producer and a release/ payment policy shall be mutually agreed upon.

### 12.  Impossibility of Performance

a) If a member of the Attraction cannot perform because of ill health, physical disability, or other circumstances not reasonably within Producer's control, Producer shall use its commercially reasonably efforts to furnish a substitute for such member and Producer shall not be liable for the failure of such member to perform nor shall Presenter be relieved of any of its obligations herein, provided the performance is given in its entirety.

Page 8

## MAMMA MIA! – SAN BERNARDINO, CA

b) Force Majeure: In the event that the performance of any of the provisions of this Agreement on the part of the Producer or Presenter shall be prevented or interfered with by an act of God, fire, national or local calamity, death or physical or other disability of any of the personnel forming part of or used in connection with the Attraction, the acts or regulations of any public authority or labor union, labor difficulties, strike, war, epidemic, storm or inclement weather, or any other cause that renders such performance impossible, such party shall be relieved of its obligations hereunder with respect to the performance(s) so prevented because of such cause, unless the obligations are covered by insurance and then only to the extent of the insurance proceeds available for such obligations. If any performance shall be prevented for any of the foregoing causes neither the Presenter nor Producer shall be under any obligation to present the Production at a different time.

c) In addition, Producer may in its discretion cancel any performance which may expose any member of the company or any portion of the audience to danger of death, disease or injury or to any outbreak of violence or civil strife. Upon such a termination, Producer shall not be liable to Presenter for any loss, damage or expense claimed to have been suffered by Presenter as a result of such termination, but where the condition upon which such termination is based shall not have been caused by Presenter or shall not have been reasonably foreseeable by Presenter, Producer shall return any monies previously deposited with Producer hereunder, after deducting only the actual and direct costs incurred by Producer in connection with such terminated performance.

d) If the Producer elects to terminate the run of the Attraction and posts a notice to that effect, the Producer simultaneously therewith shall advise the Presenter in writing of such action and shall have no further liability except to: (i) return any advance on the Guarantee which has been paid; and (ii) reimburse the Presenter for any actual documented expenses, as may be reasonable and customary, approved by the Producer and incurred prior to such notice by the Presenter in connection with the performances scheduled, but not performed, due to such termination.

### 13.    Insurance Requirements

a) Presenter agrees to defend, indemnify and hold harmless Producer from and against all liability claims for bodily injury or property damage in connection with or in relation to any actions, claims, or demands by third parties, solely based upon any acts, defaults, or neglects of Presenter and/or its employees and/or agents and/or independent contractors.

b) Producer agrees to indemnify and hold harmless Presenter from and against all liability claims for bodily injury or property damage in connection with or relating to any actions, claims, or demands by third parties, solely based upon any acts, defaults, or neglects of the Producer and/or its employees and/or independent contractors.

c) Producer and Presenter agree to carry and maintain in full force and effect Worker's Compensation Insurance and Unemployment Insurance as required by law or union contract on all of Producer's and Presenter's employees respectively. Public Liability insurance and Non-Owned and Hired Automobile Insurance with minimum limits of $5,000,000.00 and to furnish a Certificate of Insurance verifying such coverage upon request.

d) Presenter agrees to name Producer as an Additional Insured on the Public Liability policy pertaining to this engagement and to furnish a certificate verifying the insurance and the listing of Producer upon request.

### 14.    Terms of Contract

a) Nothing contained herein shall be deemed to create or constitute a joint venture, partnership, or trust relationship between the parties.

MAMMA MIA! – SAN BERNARDINO, CA

b) This Agreement contains the entire understanding of the parties, shall be amended or modified only in writing signed by both parties and shall be construed, governed and interpreted pursuant to the laws of the State of New York applicable to agreements wholly to be performed therein. Presenter shall not have the right to assign this Agreement or any of Presenter's obligations hereunder. Producer shall have the right to assign this Agreement or any of Producer's obligations hereunder to any party.

c) All notices to Presenter and Producer shall be in writing addressed to their respective address set forth herein.

15.    Remedies

If on or before the date of any scheduled performance Presenter has failed, neglected, or refused to perform any material obligation pursuant to any Agreement with any other producer, theatrical production or performer, or if the financial standing or credit of Presenter has been impaired then Producer shall have the right to (i) demand that Presenter furnish Producer with a Letter of Credit in an amount equal to the guaranteed and anticipated compensation due to Producer hereunder and in a form and substance, for a tenor and drawn on a bank acceptable to the Producer, and/or (ii) demand that Presenter immediately pay to Producer any and all guaranteed compensation due to Producer hereunder. If the Presenter breaches or defaults in the due performance of any of its material warranties, representations, or agreements hereunder (and any of such events shall hereinafter be deemed an "Event of Default"), then Producer shall have the right to terminate this Agreement and its obligations hereunder. The Presenter agrees that in such event Presenter shall nonetheless immediately pay any and all sums due and payable to Producer as set forth in this Agreement as Compensation (including, but not limited to the Guarantee) and that any and all sums previously paid to Producer shall be retained by Producer as liquidated damages, and that Producer shall immediately have the right to present for payment any Letter of Credit furnished it for payment and receive payment thereon for any and all guaranteed and anticipated compensation due to Producer hereunder. If Presenter fails or refuses to provide such Letter of Credit and/or make such payment within Forty-Eight (48) hours of written notice of such demand(s) from Producer then this failure or refusal by Presenter shall be deemed an "Event of Default" and Producer shall have the right to proceed as set forth immediately above.

16. .  Indemnity

a) Notwithstanding any other provision of this Agreement, the Presenter will indemnify, defend and hold harmless Producer and its parent, affiliates, and subsidiaries and their respective officers, agents, employees and representatives from and against any and all claims, liabilities, losses, damages, injuries, demands, actions, causes of action, suits, proceedings, judgments and expenses, including, without limitation, reasonable attorneys' fees, court costs and other legal expenses arising from or connected with: (i) any alleged or actual breach by Presenter of any provision hereof or the inaccuracy of any warranties or representations made by Presenter herein (ii) any acts or omissions by Presenter except to the extent that any claim is caused by any negligence or willful misconduct of the Producer.

b) Notwithstanding any other provision of this Agreement, the Producer will indemnify, defend and hold harmless Presenter and its parent, affiliates, and subsidiaries and their respective officers, agents, employees and representatives from and against any and all claims, liabilities, losses, damages, injuries, demands, actions, causes of action, suits, proceedings, judgments and expenses, including, without limitation, reasonable attorneys' fees, court costs and other legal expenses arising from or connected with (i) any alleged or actual breach by Producer of any provision hereof or the inaccuracy of any warranties or representations made by Producer herein (ii) any acts or omissions by Producer except to the extent that any claim is caused by any negligence or willful misconduct of the Presenter.

17.    Arbitration Procedures/ Governing Law/ Jurisdiction

Any claims, dispute, or controversy arising out of or relating to this agreement shall be submitted to arbitration in Manhattan, New York before one arbitrator pursuant to the rules then applicable of the

### MAMMA MIA! - SAN BERNARDINO, CA

American Arbitration Association. Judgement on any award rendered pursuant to such arbitration may be entered in any court state or federal, having jurisdiction, the prevailing party in the arbitration being entitled to all costs including reasonable attorney's fees.

1A.    **Right To Audit**

Presenter shall maintain and keep at its address above set forth for at least twelve (12) months after the final performance of the Attraction all true and accurate records of all ticket sales, local expenses, advertising expenses, yellow card expenses, and vouchers and receipts relating thereto. Producer's representative shall have the right to audit, inspect and copy the books and records of the Presenter with respect thereto during the presentation of the Attraction and within twelve (12) months after the last performance of the Attraction. The Presenter agrees to cooperate with the Producer's representative with respect thereto. If the Presenter does not own the theatre or have a long-term lease, the Presenter should provide Producer or have available for inspection a true and accurate copy of Presenter's lease agreement with the theatre.

It is expressly understood by both parties that THE BOOKING GROUP acts only as disclosed agent and assumes no liability hereunder. In the event of any claims by or between the Producer and/or Presenter, THE BOOKING GROUP may not be named as a party to any arbitration or litigation nor shall it be directly or indirectly responsible for the debts, obligations, responsibilities, or liabilities of the Producer or Presenter, whether or not arising in connection with this agreement or otherwise.

By its signature hereunder, Presenter agrees to the terms of this contract and acknowledges that Schedule "A" (Ticket Prices and Gross Potential), Schedule "A2" (Ticket Commissions and Discounts), Schedule "B" (the Presenter's Local Expenses), and the Technical Rider containing additional terms and provisions necessary to the presentation of the Attraction are attached hereto and are integral parts of this Agreement.

This constitutes the entire Agreement, which may not be modified, unless in writing, by both parties.

AGREED AND ACCEPTED:

PRESENTER
THEATRICAL ARTS INTERNATIONAL

by _____

title  PRESIDENT                              date  2/16/2006

PRODUCER
MAMMA MIA USA TOUR 2, LP

by _____

Devin Kendell, General Manager            date _____

Page 11

# EXHIBIT A

-----Original Message-----
To: Devin Keudell; Tom Capps; Hurell@aol.com
Sent: Fri Dec 30 00:14:45 2005
Subject: San Bernardino-California Theatre

Hi all,
Here are the highlights of the Survey trip on Thursday, 12.22.05.

*There is no space inside the theatre for the following:
   Quick-change gondolas
   Wardrobe gondolas
   Make up tables
   Wardrobe and Hair
   SM, CM workboxes
   Road Crew workboxes
   Band equipment boxes

We will need to rent three 40'trailers and one 20'trailer. Two of the 40'trailers will be positioned US of the back wall of the theatre and they will be our Quick-change areas – one for the men and one for the women. We will also fit a small table in each to serve as the hair and makeup stations. These two trailers will be delivered on Tuesday morning so that the loading door is accessible for the load in on Sunday and Monday.

The third of the 40'trailers will live SL of the theatre and house Wardrobe and Hair – we will be in the middle of getting ready for our cast changeover so this space will be tight.

The 20'trailer will be SR of the theatre and will be used for the CM workbox, SM workbox, Make-up bins, Equity cots and any other necessary boxes.

We will need to fence around these trailers but some of the fences will have to be moveable as the doors to the rear of the theatre are exits for the audience.

We will need to hire security 24/7 as the trailers will have cables for program feed and paging and they will not be completely secure. The area around the theatre is not the best.

We will have to put a tarp from the back of the theatre to the trailer to cover the walkways in and out of the theatre.

We can store one of our Mamma Mia trailers in the parking lot adjacent to the theatre to backload empties.

*The grid is wooden including the well beams.
We would like a structural engineer to sign off that the weight of our show is safe. John is putting together a document that has all of the weights of our show. He will email that to Allen Evenson today (Thursday, 12.29).

*Even if the grid is structurally sound for our show, John does not feel comfortable running the trusses in at the end of the show. Other flying elements may be compromised.

*The show deck will fit into the theatre. If we cut the ground row we will have a narrow crossover inside the building.

*The service trusses will be in the air – there is a steel beam where we can hang them extreme SR.

•The vocal booths will have to go SL – it will be tight and we will have to address some traffic issues. There will be an open door to the outside (this is how we will access the "Quick change trailers" that will be in the alley outside of the theatre) and we could potentially pick up any noise like sirens, car horns or people walking by in the vocal booth microphones.

•We would like to have a two day Advance.
    Sunday, February 19    8:00am-5:00pm    advance
    Monday, February 20    9:00am-2:00pm    advance
                           3:00pm-7:00pm    Road crew – Load-in
                           8:00pm-12:00am   Continue Load in
    Tuesday, February 21   8:00am-5:00pm    Continue Load in

•In the pit we will have to remote percussion, the drum kit, and 1 keyboard to the room in the basement. The only access to that room is down 7 steps.

•The hallway outside the pit and leading down to the pit will have to be cleared of everything in order for gear and musical instruments to be moved into the pit.

•The pit equipment and RF rack will live in a room off House right. Band gear equipment will have to be stored outside somewhere or back loaded onto a trailer.

•We will have to run paging system and program monitors into the trailers outside the theatre.

•The FOH mix position is adequate and the FOH lightboard position is adequate.

•Electrics and Automation will have enough room SR - Allen will make sure that the hallway off SR and room DR are cleared for us.

•There are no washers or dryers or hookups. All laundry will have to be taken to a laundromat.

•The dressing room space will be very tight. We will have to add additional stations into the dressing rooms on the second floor SR. The access to all dressing rooms is via stairs.

•There is a small room DSL that will be used for a quick-change room for Sophie – I think we will only need it for her change before the Wedding. None of the dressing rooms are far in a theatre this size!

•We will have some seat kills – the house has 1700 seats and it is wide. I anticipate having to mark 100 seats (conservative estimate) either obstructed or not available.

I think that is all for now. The space is incredibly tight for us – needless to say. It will be very trying at best and it will be like nothing we have ever done before. I am sure once the show is in the space it will look great – it is a beautiful theatre it is just way too small for us. Allen Evenson is our contact there and he has been incredibly accommodating in trying to help us fit in the theatre. Once we have confirmation that the structural engineer has signed off on the wooden grid I will let everyone know.

Best,
Beth

| MAMMA MIA! FEBRUARY 21 - 26, 2006 | SAN BERNARDINO, CA CALIFORNIA THEATRE |

745

|            |      |      |
|------------|------|------|
| Monday     |      |      |
| Tuesday    | 8:00 |      |
| Wednesday  | 2:00 |      |
| Thursday   | 8:00 |      |
| Friday     | 8:00 |      |
| Saturday   | 2:00 | 8:00 |
| Sunday     | 2:00 | 7:00 |

House Capacity per show    1579

| Price Sched A: | ALL PERFORMANCES |              | PRICE SCHED B |            |
|----------------|------------------|--------------|---------------|------------|
| 168 seats @    | $75.00           | $12,600.00   | 48.75    8,556 |           |
| 1278 seats @   | $65.00           | $82,745.00   | 40.00    55,920 |          |
| 60 seats @     | $50.00           | $3,000.00    | 28.75    1,725 |           |
| 77 seats @     | $38.50           | $2,964.50    | 24.75    1,905.75 |   (3) 503,270 |
|                |                  | $101,309.50  | 5   62,968.75  |           |
|                |                  |              | 5   -$510,476.00 |         |

TOTAL # PERFORMANCES PER WEEK        8

TOTAL POTENTIAL GROSS PER WEEK        $810,476.00

TOTAL GROSS AFTER TAX PER WEEK        $810,476.00        0.00%

AGREED AND ACCEPTED:

PRESENTER                            PRODUCER
THEATRICAL ARTS INTERNATIONAL        MAMMA MIA USA TOUR 2, LP

by                                   by
This  PRESIDENT                      Devin Kendall, General Manager
Date  2/16/2006                      Date

| THE BOOKING GROUP | SCHEDULE A | TICKET PRICES & GROSS POTENTIAL |

12/28/2005  02:20   9092444354                    EVENSON                          PAGE  15

01/26/2006  23107   9090058672                THEATRICAL ARTS                      PAGE  15/26

---

**MAMMA MIA!**
**FEBRUARY 21 - 26, 2006**                        **SAN BERNARDINO, CA**
                                                   **CALIFORNIA THEATRE**

| | | |
|---|---|---|
| Monday | | |
| Tuesday | | 8:00 |
| Wednesday | | 8:00 |
| Thursday | | 8:00 |
| Friday | | 8:00 |
| Saturday | 2:00 | 8:00 |
| Sunday | 2:00 | 7:00 |

House Capacity per show:                          1578

**TAX:**                                          0.00%

**BOX OFFICE COMMISSIONS:**  Group Discount
                             Subscription Discount

| | |
|---|---|
| Phones | 4% |
| Credit Cards | 4% |
| Internet | 4% |
| Remotes/Outlets | 4% |

REMOTES, PHONES & INTERNET ARE INCLUSIVE OF CREDIT CARDS

---

THERE SHALL BE TWO COMPLIMENTARY TICKETS ALLOWED WITHOUT WRITTEN APPROVAL
FROM PRODUCER'S REPRESENTATIVE.  —  300 Approved Trade Comps

| PRESENTER | PRODUCER |
|---|---|
| THEATRICAL ARTS INTERNATIONAL | MAMMA MIA USA TOUR 2, LP |
| by _____ | by _____ |
| Title  PRESIDENT | Devin Kendall, General Manager |
| Date  2/16/2006 | Date _____ |

---

THE BOOKING GROUP           SCHEDULE A2          TICKET DISCOUNTS & COMMISSIONS

12/20/2005  02:20  9092444354                     EVENSON                         PAGE  16

01/20/2006  29:37  9858858672                      THEATRICAL ARTS                PAGE  16/26

---

| MAMMA MIA! | SAN BERNARDINO, CA |
|---|---|
| FEBRUARY 21 - 26, 2006 | CALIFORNIA THEATRE |

**LOCAL FIXED PER WEEK**
Box Office
Catering
Cleaning
Direct Mail
Group Sales Expenses
Houseman/TD
House Staff
In-House Equipment Rental
League Fees
Licenses/Permits
Linen/Auto
Opening Night
Piano Rental/Tuning
Police/Security
Program
Public Relations
Rent
Ticket Printing
Usherss

$40,620   LOCAL FIXED PER WEEK

            LOCAL VARIABLE PER WEEK (not always but per week)
110,200-$85,000   Advertising                    (Amortized)
        TBD   ADA Porter
        TBD   Ticket Cleaning
(TBD)   TBD   Stagehands & Loaders EST MATES
        TBD   Truck Rental for Trunk Delivery
        TBD   Wardrobe/Hair       (Includes SE hours of daywork w/benefits & tax burden)
        TBD   Expenses as necessitated by local conditions as outlined on EXHIBIT A

$90,000   SUB-TOTAL PER WEEK

$130,620   TOTAL LOCAL EXPENSE PER WEEK

---

AGREED AND ACCEPTED:

PRESENTER                           PRODUCER
THEATRICAL ARTS INTERNATIONAL       MAMMA MIA USA TOUR 2, LP

by_____            by_____
                                      Devin Kendall, General Manager
Title    PRESIDENT
                                   Date_____
Date   2/18/2006

---

| THE BOOKING GROUP | EXHIBIT B | LOCAL EXPENSES |
|---|---|---|

## MAMMA MIA! – TOUR #2

### Technical Requirements
(Rider Dated 5/4/04)

*In the following pages, we will outline for you the technical requirements for the touring production of "Mamma Mia!" Your cooperation and advance preparation will facilitate an efficient load-in, set-up, run and load-out. We hope to cover all areas of concern, but if you have additional questions after going through this document please feel free to contact us with further questions.*

## MINIMUM STAGE REQUIREMENTS

Minimum proscenium width opening:          40' 0" (20' 0"  left and right of center)
Minimum stage depth (from first working set): 27'-0"  32'-0"
Minimum stage width:                         7'  74' 0" (37' 0" left and right of center) 34' and 37'
Minimum grid height                          65' 0"
Minimum width between fly floors:            64' 0" (32' 0" left and right of center)
Minimum height clear under fly floors:       26' 0"
Minimum size loading door:                   8' 0" wide X 9' 0" high

## SEATING HOLDS

Sound console: See Sound Department
Followspots: See Electrics Department
Electrics Console: See Electrics Department

Sightlines:     See Sound Department (Towers)

## GENERAL REQUIREMENTS

1.  Please mail a copy of current local union contracts to the New York office mailing listing the prevailing local union rates at least six (6) months prior to the engagement.

2.  Please fax or mail a copy of the current hanging plot (line set positions) to the New York office as soon as possible. Fax (212) 221-3222.

3.  Please mail a complete and detailed ground plan and section on the stage and house (in scale) to the New York office as soon as possible. Also, please include a copy of the dressing room layouts.

4.  We require the following for both the in and out:

    1 -  2 ton 6' forklift & qualified operator (2 if required by local conditions i.e. no level truck dock). Must be there with arrival of 1st truck.
    1 -  36' genie lift
    1 -  truck rental for delivery of trunks per Actors' Equity Association regulations.

5.  It is imperative that all areas of the stage, fly system, backstage, loading docks, dressing rooms, storage areas, orchestra pit, and productions offices be completely clear and broom clean prior to the start of the advance load-in. Strip all lighting equipment from Box booms 1 and 2, as well as the balcony rail (or cove).

1

6.  All personnel called for the load-in, load-out, and performances of the production must be qualified in their department and prompt for the starting times of all calls.   ALL STAGEHANDS EMPLOYED ARE EXPECTED TO BRING BASIC TOOLS. (I.E. A HAMMER, PHILLIPS SCREWDRIVER, SLOTTED SCREWDRIVER, CRESCENT WRENCH, PLIERS, AND A TAPE MEASURE.)

7.  ANY STAGEHAND SHOWING UP FOR WORK OR SHOW CALLS SHOWING ANY SIGNS OF DRINKING OR SUBSTANCE ABUSE WILL BE DISMISSED ON THE SPOT.

8.  It is expected that when a stagehand begins working in one department that the stagehand will continue in that department for the duration of load-in. Further, it is expected that when a stagehand accepts a job on the running crew that said stagehand will remain on the job for the duration of all performances.

9.  Some stagehands will be required to wear black clothing in order to avoid being seen while in the wings.

10. This production travels in eight (8) 53-foot tractor-trailers, plus 1 advance tractor-trailer.  For the load-in and load-out please arrange to have all available parking spaces in the immediate area of the loading dock clear and available for trailer parking and unloading.  It is extremely important that the movement of the trucks not be obstructed by cars parked on the streets and lots surrounding the theatre.  Should it be necessary for our trucks to block streets or impede local traffic in any way, it is the local presenter's responsibility to arrange for required permits, reserve parking spaces, and/or hire any metropolitan police detail (if required).

11. A portion of the running crew will be called to work up to one and one-half (1 1/2) hours prior to each show to preset the stage while others will be called at half-hour.

## CARPENTRY DEPARTMENT

## IF YOU ARE UNABLE TO COMPLY WITH ANY OF THE FOLLOWING REQUIREMENTS, PLEASE NOTIFY US IMMEDIATELY.

1.  FLY SYSTEM AND THE STAGE AREA MUST BE CLEARED OF ALL SCENERY, ELECTRICS, DRAPES, BAND SHELLS, SCENERY AND PROJECTION SCREENS PRIOR TO THE LOAD IN. THIS IS ABSOLUTELY ESSENTIAL.

2.  The orchestra pit will be used by our (9) traveling musicians. Please ensure that it is clear and ready to accommodate our band equipment.

3.  There must be 5500 lbs. of weight, over pipe weight, available on the loading gallery before the arrival of the production. This weight is doubled (11,000 lbs. over pipe weight) in a double purchase house.

4.  Carpenter must be able to lag into deck, which must be level and structurally sound.

5.  ~~Linesets must be kickable.~~

6.  We require no less than 30 spotted lines with 2 wheels per line and a commensurate amount of 5/8" hemp, available at the time of the advance spotting call.

7. A phone line should be made available backstage for the Automation Carpenter for the run of the show. This line should have access to long distance via a 1-800 number.

## ELECTRIC DEPARTMENT

1. POWER REQUIREMENTS

   A. **AUTOMATION REQUIRED POWER:** 1 200-amp 208VAC 3-phase Y power with ground and neutral. Power should be fused and have a disconnect switch with lugs.

   B. **LIGHTING REQUIRED POWER:** Two (2) 400-amp 3-phase 5-wire with ground switches. Power needed within 50' of Dimmer Rack Location. Rack location to be downstage right.

   C. **SOUND REQUIRED POWER:** Unique (AUDIO ONLY) 3 phase 200 Amp service with isolated ground - may not be shared with any other powered systems (i.e. Dimmers, Automation Motors, Air Conditioning etc.). Power needed within 50' of Amplifier Racks. Rack location to be determined by Road Sound Operator.

   House power feed must maintain a minimum of 208 volts and be configured in a "Y" phase. If the voltage drops below 208 volts, the computer controlled motor effects may not work properly. The production requires a cold water pipe or earth ground. If a cold water pipe is provided, it must be a filled pipe. A standpipe is not acceptable. If the power feeds do not terminate in a location as specified above it is the responsibility of the local presenter to provide the necessary feeder cable, etc. to insure that the power feed terminates as specified.

2. Before the start of the load in, all on-stage electrical pipes, box booms 1 and 2, and balcony rail or cove **must** be cleared of instruments and their raceways and feed cables.

3. Please supply the New York office with any local electric restrictions or codes. If specific permits are required, it is the responsibility of the local presenter to secure these permits prior to the start of the load-in.

4. The local presenter must provide one 20 amp non dim circuit in pit for music stand lights.

5. The production requires the presenter to provide three (3) color-balanced 2kw (or 2.5kw) Lycian Followspots, or three (3) matched Strong 2 kw (or 2.5kw) Xenon Super Trouper followspots. Each followspot must put out a minimum of 200 foot candles. This measurement should be taken at the plaster line. Followspots should be central at the rear of "High Balcony" level, in a soundproof booth. Audience heads/hands should not interfere with followspot beams when audience stands in the back row. These followspots must be in position and checked that they are in good working order prior to the load-in and can in no way be part of the load-in work calls. The touring electrician will check the followspots to make sure of their condition. Any work he deems necessary will be at the cost of the local promoter. A spare lamp must be included in case of lamp failure.

6. We require an area approximately 6 feet deep and 8 feet wide for our lighting consoles with a clear view of the stage. This may be set up a tech booth, or in the back of the orchestra seating. If no such space is available for this position, seats may need to be removed to accommodate it. Please discuss this with the production staff in advance.

3

12/26/2005  02:20    9092444354                    EVENSON                              PAGE  20
01/26/2006 23:49  9696965672    Document 11  THEATRICAL ARTS  Filed 08/15/2006    Page 26 of 36  PAGE  20/25

Case 2:06-cv-06079-CM

7.    This production utilizes the following positions:

   * Balcony Rail
   * Near Box Boom
   * Far Box Boom

Balcony rail and far box booms can be installed in a cove.  If adequate positions do not exist, they will need to be installed.  Please discuss with the production staff in advance.

8.    In some theatres, we will be hanging service trusses SL and SR – 4 points each.  The points must hold 1,500 pounds.  Service truss weighs approximately 4,000 pounds.

9.    We require 200 lbs. of dry ice per performance.  Dry ice must be cut in slabs.  A storage container must be provided, large enough to store all required dry ice.

## SOUND DEPARTMENT

**SOUND REQUIRED POWER:** Unique (AUDIO ONLY) 3-phase 200 Amp service with isolated ground - may not be shared with any other powered systems (i.e. Dimmers, Automation Motors, Air Conditioning etc.).  Power needed within 50' of SR Service Truss.  Minimum service to safely operate the show is 100 Amp, 3-phase.  Actual current draw is in the neighborhood of 80 Amps per leg.

## SOUND DEPARTMENT

1.    Our Sound Mixing position is 8' x 12'.  The sound mixing position must be near the centerline at the rear of the orchestra section of the house within the seating section or immediately behind the seating section and preferably within sight of the center cluster.  Any seats must be removed prior to the beginning of the load-in.  The console area provided must be level, with a flat surface.  Easy access and egress to sound position by sound operator is necessary throughout the performance.  The show cannot be mixed from a closed room or room with a window.  Under all circumstances, our production will run and use its own multi-cable to and from the sound position and the stage area.  The venue must ensure that the cable run from the FOH to the stage is clear of audience traffic and is NOT run through conduits/pipe/tubes which would pinch, bend or otherwise damage the cables.  Due to scheduling, it is preferable to run the cables along the seating of the Orchestra level.

2.    We will require a center cluster truss position for the production.  We travel with a truss system and two 1/2 Ton motors for this purpose if house motors/winches are not available in this position.  Our center cluster weighs approximately 1000 lbs including the truss and rigging.  If a house truss is permanently mounted (non removable) in this position please contact the New York office immediately.  The house chain motor points must be appropriately spaced in order to rig the production truss.  We can accommodate spacing between points (either side of center) of up to 20 feet.  If required, any existing house cluster, proscenium and delay speakers must be removed.  The show will need full access to hang necessary proscenium speakers, delay speakers and video equipment in the theatre.    *Best Effort*

3.    We carry a complete sound system and insist that our own console, microphones, playback devices and speaker system be used.  We reserve the right to use our own speaker system exclusively.  If it is determined by our soundman to be advantageous, we will tie into your house sound and/or paging

4

system with a 600-ohm LINE LEVEL output and use it in addition to our system. We will require full access to all house sound, paging, video and hearing-impaired systems.

4.   This production will utilize 40 channels of UHF Wireless Radios, 10 channels of UHF HME Comm. and at least 8 channels of UHF Motorola walkie-talkies. The use of walkie-talkies or other broadcasting devices in the theatre other than those provided by the show is not allowed.

5.   A phone line should be made available at the sound console position for the run of the show. This line should be compatible with a modem (not digital in other words) and should have the ability of accessing long distance via a 1-800 number.

6.   A functional dressing room paging system is required. This system should allow patching from our systems via a 600-ohm LINE LEVEL input. If the theatre does not have functional paging speakers in all backstage areas (including dressing rooms) please inform the New York office immediately.

7.   The production travels with a pair of 24' high sound towers that will be placed on either side of the stage. The footprint of each tower is 40" wide (SL to SR) and 36" deep (up and downstage). These towers, when loaded with speakers and rigging, will each weigh in excess of 2000 lbs. The venue/presenters shall be responsible for ensuring the safety of floor loading as well as the ability of fastening the tower to the building through the proscenium wall and/or with an overhead steel safety cable. Placement of the towers will be at the discretion of the production.

## PROPERTY DEPARTMENT

1.   We require a professional upright piano (not a console), on a piano dolly, which must be tuned (A=440) before the first rehearsal in each city and thereafter every week. The piano is for rehearsal purposes only.

2.   We require 20 music stands with stand lights and chairs in the orchestra pit for the musicians.

3.   Please be certain that there are at least 80 chairs total for use in the dressing rooms, backstage, and in the orchestra pit.

4.   We require black carpeting or drape for the front and back walls of the pit, and black or dark grey carpet covering the pit floor.

5.   Push brooms, mops, buckets and a vacuum must be available.

6.   Two onstage water coolers must be provided, stationed upstage left and upstage right, for the duration of the engagement. Please place an initial order of 30 5-gallon jugs, and we will request to replenish as necessary.

7.   The orchestra pit must be clear except for items listed above.

## WARDROBE DEPARTMENT

1.  At least 6 - 15 amp 115 V circuits are required in the wardrobe area.

2.  In the wardrobe area, there must be 6 six- or eight-foot work tables (at least two must be 8 feet) and 10 chairs, 10 rolling racks, and 2 large garbage cans.

3.  ~~Local presenter must provide 2 full size washers and dryers on the premises (or 1 of each, plus hookups for a second), for show use only. Washers must have individual cycle capabilities and water levels. Dryers must be 220 volts. Coin operated machines will be at the expense of the theatre. Appliances must be in full running condition on the first day of the load-in.~~

4.  ~~The production travels with 1 washer and 1 dryer. These machines will require appropriate electrical and water hook up adjacent to the in-house washers and dryers, should it be necessary to use them.~~

5.  Crew Information:  It is imperative that the same people work the load-in, load-out and performances. Of the total personnel, four must be experienced stitchers. Ideally, the composition of the wardrobe crew should be six females and three males. If this is not possible, at least 5 members of the crew must be female.

6.  Crew Calls:  There will be two four-hour work calls each week, on days to be determined by the wardrobe supervisor based on the performance schedule (usually Tuesday and Friday). The wardrobe crew will also be called for a one hour continuity call before the half-hour call before each performance except for the two days on which there is a work call.

7.  ~~A fully-functioning utility sink with hot and cold running water will be needed for the cleaning and rinsing of costumes and wigs. This sink must be nearby the wardrobe and wig rooms yet separate from any sink used by theatre custodial and cleaning staff.~~

8.  Wardrobe area must be well-lit and well-ventilated.

## HAIR/WIG DEPARTMENT

1.  At least 3 - 20 amp circuits are required in the wig area.

2.  The wig area must be well-lit.

3.  In wig area, there must be 1 six- or eight-foot work table with 1 - lighted mirror space, 1 height-adjustable chair, and 1 - trash can.

4.  ~~A deep sink with hot and cold running water (see Wardrobe Department #7) is required.~~

5.  Crew Information:  It is imperative that the same person works all of the performances. The hair crew member will be called from half-hour through the end of the performance.

07/28/2006  10:25  3236655154  HARMONY ARTISTS  PAGE 23

## ORCHESTRA REQUIREMENTS

This production's orchestra is self-contained, and will use the orchestra pit. See Props requirements for chair and stand needs.

The conductor for Mamma Mia plays keyboards and conducts form a seated position. ~~The podium space requirements are slightly larger than usual. This production travels a platform which is 58" (4'10") square and can be raised to a maximum height of 43" (3'7"). The keyboard, stand, music stands, conductor's chair and Pit Mix (for monitoring) all fit on this platform. The conductor must be able to see the deck from a seated position behind the keyboard and have access to all equipment mentioned above. There must be enough space between the edge of the stage and the pit wall behind the conductor, to accommodate necessary adjustments to our traveling podium.~~

## DRESSING ROOM REQUIREMENTS

1.  Our company consists of 30 performers, 1 conductor, 8 traveling musicians, 3 stage managers, 2 company managers, and a crew of 14 (including 2 wardrobe and 1 hair person).

2.  The dressing room requirements are as follows:

         8  -  Principal (1 person) Dressing Rooms
         2  -  2 person Rooms
         2  -  Large Chorus (12 people) Rooms
         1  -  Conductor Dressing Room
         2  -  Band Room (accommodating up to 6)

3.  All performers' dressing rooms must be cleaned - floors, make-up tables, mirrors, sinks and bathrooms - prior to the START of the load-in and maintained daily. These rooms must be well-lighted with burned out bulbs replaced daily. They must have hot and cold running water, wardrobe racks, etc. in accordance with Actors' Equity Association requirements. Chairs, not stools or benches, are required at each space to be used by a performer.

4.  Additionally, we will need the following rooms for staff personnel, which can be securely locked. Please provide keys to Stage Managers upon arrival.

    1    Room for Company Management with 2 private telephone lines and 1 private line for a fax, with no rollover features. For the fax, we prefer to have direct-dial long distance (not an in-house switchboard), in order to program autodial numbers into the machine. We will use a long distance calling card for this purpose.

    1    Room for Stage Management with 2 private telephone lines (one must be suitable for fax machine hook-up.)

    1    Room for Wardrobe Department (see Wardrobe Requirements)

    1    Room for Hair/Wigs Department (see Hair/Wigs Requirements)



## SECURITY INFORMATION

We require security personnel for each performance to arrive at the theatre 90 minutes before each performance and remain at the theatre until the last company member has departed. Throughout the engagement, all areas used by the company must be secured to the satisfaction of the company's representative. In addition, the stage door must be accessible for any scheduled work calls and/or rehearsals.

## MANAGEMENT REQUIREMENTS

Please mail the following to Nina Lannan Associates, 1450 Broadway, Suite 2011, New York, New York, 10018, as soon as possible:

- List of the theatre personnel and presenting organization's personnel with their private office numbers and home phone numbers if possible.
- List of local doctors to include general practitioner, ear, nose and throat, chiropractor, podiatrist, dentist and OB/GYN, and appropriate hospital or medical center for emergency treatment; as well as a listing of local transportation, laundry facilities, drug store, grocery stores, health clubs, post offices, and nearby restaurants and hotels.
- A copy of the house seating plan which includes all seating areas.

## ESTIMATED LOCAL CREW REQUIREMENTS

The following is an estimate of the number of local stagehands needed and approximate call times. Actual numbers of personnel may vary depending on local circumstances. These call times may increase or decrease and a final determination of personnel and call times will be made by the Head Carpenter.

## PRE-ENGAGEMENT SPOTTING CALL

| 8 hour call | | |
|---|---|---|
| | 1 | Head Carpenter |
| | 13 | Carpenters (5 riggers: 4 up, 1 down) |
| | 1 | Head Electrician (if necessary for tie-ins) |
| | 1 | Head Props (only if required by local conditions) |
| | 6 | Sound |

## LOAD IN (Yellow Card)

Our typical Load-in call is 13 hours spread over 2 days as follows:
Monday evening   5 hours
Tuesday          8 hours

The estimated Load-out call is 5 hours. Load-out will begin at the closest hour following the final performance. This is also the minimum call and is subject to local conditions.

| | IN | RUN | OUT |
|---|---|---|---|
| Carpentry | 8 | 5* | 14 |
| Electrics | 8 | 3* | 8 |
| Sound | 4 | 1 | 8 |
| Props | 2 | 2 | 6 |
| Wardrobe | 9 | 9 | 9 |
| Hair | 1 | 1 | 1 |
| Loaders | AS NEEDED | | |

8

Pushers        AS NEEDED

*If local conditions do not allow the house electrician to perform deck cues, the number of local electricians will be raised to 4.

## WORK CALLS

Any stage crew work calls will be scheduled as necessary, with advance notification.

## TRUNK PICKUP & DELIVERY

Approximately 45 large personal trunks are transported with the production, and these need to be dropped off at one or more hotels during the Tuesday load-in. A truck with lift gate should be made available (a 22' rental truck is adequate for this purpose), and our road Props Supervisor will advise in advance any additional labor needs and furnish delivery information. On our final performance day, a truck will again be needed, to collect trunks from the hotel(s) and return to the theatre for loading.

## CATERING

LOAD-IN:  The local presenter must arrange to provide lunch (hot or cold sandwiches and assorted beverages) for local and touring sound crew during the Tuesday load-in. This may be ordered from a local takeout restaurant or deli (menu choices are appreciated), for delivery to the stage door at noon. If the theatre has an exclusive catering agreement, then the house caterer should be given this information.

LOAD-OUT:  In most theatres, our crew and all local stagehands assigned to the load-out will require a catered hot meal if the load-out is scheduled to go beyond five hours. The catered hot meal will need to be catered at split shifts:  5 hours after final curtain and 5.5 hours after final curtain. The load-out catering will be for approximately 55-60 people and should not be breakfast. Please confirm with the head carpenter to see if a meal is required.

MATINEE DAYS: In addition, catered meals (no pizza, but must be hot meal -- no deli and grill trays) will generally be necessary between shows on 2-performance days, when the scheduled performance start times are less than 5 and ½ hours apart, or as dictated by local union conditions. Meals are for up to a total of 40 stagehands, road crew, and wardrobe, however, this is an estimated number, which may increase or decrease as determined by performance schedules and union regulations.

## HOUSE MANAGEMENT

1.  Running times are:  Act  I – 1:04 and Act  II – 1:06.  We prefer 20-minute intermissions. House management will be advised by our Stage Managers of the seating hold policy, and should instruct the usher staff accordingly.

2.  In the event of a change in cast, it will be necessary for the ushers to place printed announcements in each house program at no additional expense to producer. The production stage managers will supply these pre-printed announcements to the house 30 minutes before scheduled curtain.

## PRESENTER AVAILABILITY

The Presenter or a representative must be available at all times to the Road Carpenter and the Production Stage Manager from one hour prior to the load-in to the end of the final performance. This person must be able to make decisions on behalf of the Presenter.

9

## SUMMARY OF MATERIALS TO BE MAILED TO THE NEW YORK OFFICE

- Union Contracts with prevailing rates
- Hanging plot (line set positions)
- Ground plan and section in scale of stage dimensions and dressing room layout
- The location, size, and access of the loading door
- Local electric restrictions and codes
- Parking availability/accessibility at the theatre, for rental cars of managers and crew.
- Names & phone numbers of Carpenter/Tech Director, Electrician, Theatre Manager, Concessions/Souvenir Manager, Presenter Contact
- House seating plan
- Doctor and local orientation list

In the event that the minimum technical and production requirements of this rider are not met, additional equipment and personnel not specified in this rider may be required.

If there is any further information you require, or if you anticipate any difficulty in meeting the needs as stated above, please contact:

Nina Lannan Associates
Devin Keudell
1450 Broadway, Suite 2011
New York, NY 10018
(212) 221-1122 (phone)
(212) 221-3222 (fax)

Tour Personnel - (reachable through the Management office if no number is listed):

| Position | Name | Contact |
|---|---|---|
| General Manager | Nina Lannan & Devin Keudell | dkeudell@nlannan.com |
| Stage Manager | Glynn Turner | 347-423-8030 |
| Head Carpenter | Herb Woodruff | 612-743-6709 |
| Head Electrician | Todd Davis | 917-554-5586 |
| Head Sound | Richard Camuso | 954-294-4108 |
| Head Props | Byron Reynolds | 954-914-6407 |
| Wardrobe Supervisor | Sandy Hanlon-Cressler | 702-595-9024 |
| Company Manager | Robert Tevyaw | bobtevyaw@aol.com |

10

# BOOKING AGREEMENT

145 West 45th Street
8th Floor
New York, NY
10036

Agreement made this 23RD day of DECEMBER, 2005 by and between

212-869-9280
Fax
212-869-3028

**MAMMA MIA USA TOUR 2, LP**
(the "Producer")

and          **THEATRICAL ARTS INTERNATIONAL**
located at   **C/O HARMONY ARTISTS**
             **8455 BEVERLY BLVD., SUITE 400**
             **LOS ANGELES, CA 90048**
Contact: Joseph Henson Phone: (909)855-5152 Fax: 1-909-885-8672
(the "Presenter")

It is mutually agreed by and between Producer and Presenter as follows:

1. Presenter desires to present and Producer agrees to provide a theatrical touring company of

**MAMMA MIA!** (the "Attraction") in **SAN  BERNARDINO, CA** (the
"City")
for the following performances:

**FEBRUARY 21 - 26, 2006 (8 Performances)**
**TUESDAY - SATURDAY EVES @ 8:00PM**
**SATURDAY & SUNDAY MATS @ 2:00PM**
**SUNDAY EVE @ 7:00PM**
(the "Performances")

2. Presenter agrees to engage, and shall have the exclusive right to present, the Attraction in
the City for the performances listed above, and agrees to furnish the

**CALIFORNIA THEATRE** (the "Theatre") located at:
**562 W. 4TH STREET**
**SAN BERNARDINO, CA 92402**
with a seating capacity of: 1,578.

The seating capacity listed above includes any and all seats available for occupancy, including
any corporate and/or sponsor seats and viewing rooms.

Presenter warrants that it owns or has a valid and effective lease for the Theater for the period
from: 8:00 AM on Monday, February 20, 2006 (the exact day and time of a prior
spotting call shall be scheduled by Producer) until Midnight on Sunday, February 26,
2006 or until the Load-out is completed, whichever is later.  (the "Term").



THE
BOOKING
GROUP

B

## MAMMA MIA! – SAN BERNARDINO, CA

3.    Definition of Net Adjusted Gross Weekly Box Office Receipts (NAGWBOR)

Net Adjusted Gross Weekly Box Office Receipts (hereinafter "NAGWBOR") shall be defined for purposes of this Agreement as all Gross Weekly Box Office Receipts (hereinafter "GWBOR") from any source whatsoever from the sale of tickets at the ticket prices as set forth on the attached Schedule "A" (Ticket Prices and Gross Potential) to performances of the Attraction hereunder less only as follows:

a) The charges set forth below in addition to any other reasonable service or postage and handling surcharges paid by ticket purchasers over and above the ticket prices as noted below:

Restoration Charge                                                          N/A

The GWBOR will not be subject to surcharges other than those described above. All surcharges must be listed herein or must be mutually agreed to in writing by both parties in a separate addendum of this agreement; if such a surcharge is not disclosed and mutually agreed upon, it will not be allowed.

b) Any discounts as set forth on the attached Schedule "A2" (Ticket Discounts and Commissions), or otherwise agreed to in writing. Group sales discounts shall only apply to groups that attend the same performance, unless approved in writing in advance.

c) Any tax or taxes, imposed on the sale of tickets as set forth on the attached Schedule "A2", and actually collected and paid to governmental tax authorities. The tax or taxes shall be calculated on the GWBOR only after the discounts and charges set forth in sub-paragraphs 3. a) & b) above have been deducted. Presenter agrees to provide documentation and proof of payment of these taxes. Presenter warrants that the GWBOR shall not be subject to taxes other than those specifically indicated. State 2.46% must be allowed or have waiver.

d) The ticketing commissions only as set forth on the attached Schedule "A2". These commissions shall be calculated on the GWBOR only after the discounts, charges and taxes set forth in sub-paragraphs 3. a), b) and c) above have been deducted. Presenter warrants that each ticket sold shall not be subject to more than one of the ticketing commissions set forth on Schedule A2. (For example, Credit Card Commissions cannot be taken on Subscription and Group ticket sales). Presenter additionally warrants that the GWBOR shall not be subject to ticketing commissions other than those specifically listed on Schedule A2. Presenter shall not be obligated to furnish substantiation or documentation for the commission rates set forth on Schedule A2, but shall provide bona-fide documentation (for example, a signed group contract, etc.) calculating the amount of groups, phone sales, remote sales and subscription tickets sold and method of payment.

MAMMA MIA! – SAN BERNARDINO, CA

4.     Compensation to Producer

A.  The NAGWBOR as defined in paragraph 3. above for the performances hereunder shall be paid and
distributed as follows:

1)     Presenter agrees to pay Producer a weekly Guarantee (based on an eight performance week) of:
THREE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($375,000.00) PER WEEK, payable by 2PM
the day of the first performance of each playing week hereunder (No deposit is required for this
engagement), plus (it is understood that Presenter shall pay any and all Local Expenses (as described herein)
and that the Presenter shall not be obligated to furnish substantiation or documentation for Presenter's Local
Fixed Expenses. Presenter agrees to pay Producer the Guarantee as set forth above, irrespective of the actual
gross box office receipts derived from the sales of tickets to the performances hereunder, without any
deduction, charge, set-off or withholding of any kind, except as specifically provided for herein). The
guarantee and fixed expenses shall be pro-rated accordingly for any week with less than eight
performances. *Until receipt of Certification*

*No later than 2 PM prior to first performance*

2)     Producer shall receive overages of EIGHTY PERCENT (80%) of the weekly NAGWBOR remaining
after the payments described in sub-paragraphs 2) a. and b. below payable no later than Intermission of the
final performance hereunder.

    a.  The Guarantee set forth above, and after:

    b.  The Presenter's Local Expenses as follows:

        1)  The weekly "Local Fixed" expenses in the maximum amount(s) set forth on the attached
        Schedule "B", it being understood that Presenter shall not be obligated to furnish
        substantiation or documentation for Presenter's weekly "Local Fixed" expenses.

        2)  The actual weekly "Local Documented" expenses with estimates as set forth on the
        attached Schedule "B", it being understood that Presenter shall furnish complete, accurate
        and detailed substantiation and documentation of Presenter's weekly "Local Documented"
        expenses with documented invoices and proof of payment, subject to Producer's approval,
        not to be unreasonably withheld.

        The Presenter's Local Expenses shall be reimbursed only as set forth on the attached
        Schedule "B" as Presenter's "Local Fixed" and "Local Documented" expenses (and as those
        expenses are further defined herein) and only for items that fall within the specific
        categories for which an estimated dollar value is shown.  The specific categories and
        amounts of Presenter's Local Expenses shall be subject to Producer's prior written
        approval, and once approved shall be attached and made part of this agreement.

B.  All payments due hereunder shall be made by company check or wire transfer payable to: MAMMA
MIA USA TOUR 2, LP.  Any advance payments shall be sent to MAMMA MIA USA TOUR 2, LP, c/o The
Booking Group, 165 West 46th Street, 8th Fl., New York, NY 10036.  For any Company bills due after the
close of the engagement, please mail to:   MAMMA MIA USA TOUR 2, LP, c/o Nina Lannan Associates,
1450 Broadway, Ste. 2011, New York, NY 10018.

FEDERAL ID #: 13-6198636

5.     Production Information

Producer shall furnish the following elements of the Attraction which shall be fully rehearsed and directed
and with a complete physical production as specifically set forth below:

## MAMMA MIA! – SAN BERNARDINO, CA

a)  All salaries, fees, and per diem expenses of Producer's employees, including all members of the cast, stage managers, traveling stagehands, traveling wardrobe personnel, traveling musicians including the musical director, traveling hairdressers, national press representatives and/or traveling press agent, general manager and company manager.

b)  All royalties and fees payable to the directors, designers, and Producers and the authors and owners of the performing rights of the Attraction.

c)  Producer's general and administrative expenses, including but not limited to legal and accounting fees, office charges, booking fees and commissions, telephone, xerox and messenger charges, insurance premiums on Producer's policies insuring Producer's equipment and personnel.

d)  All costs associated with the design, building, and rental of any and all elements of the physical production including sets, props, costumes and wigs, and all rentals on equipment furnished by the Producer.

6.     Presenter Personnel, Services & Facility Requirements

Presenter will make all necessary local arrangements with third parties and provide the local services and facilities and local personnel (including all salaries, fees, and any and all payroll taxes and fringe benefits applicable to all local personnel) as required by Producer to present a successful run of the Attraction at the Theatre in the City in accordance with theatrical industry custom and practice. It is specifically understood that the Presenter shall be solely liable for and shall pay all "Local Expenses" directly, except as otherwise agreed to herein, of every kind in connection with the presentation of the Attraction, as detailed in the attached Technical Rider and Schedule B.

a)  Presenter shall furnish, and provide for the maintenance and cleaning of the theatre for the Term of this Agreement at its own expense. Presenter agrees that there shall be no discrimination practiced in the Theatre on the basis of race, color, age, creed, sex, disability or sexual orientation against any performer or patron as to admission or seating in the Theatre. Presenter shall enter into a theatre lease agreement (the "Theatre Lease") with the owner of the Theatre.

1.  The Theatre Lease shall provide that the owner will furnish the Theatre at the start of the load-in clean, electrified, fully staffed, free and clear of any bandshells, motion picture screens or other impediments, properly licensed and with such heat and/or air-conditioning as is required for comfort, for the exclusive and sole use of the Producer for the Term of this Agreement.

2.  The licensed premises shall include the Theatre (including but not limited to audience area and seats, stage and backstage areas, orchestra pit areas, existing permanently installed sound and lighting equipment, box booms, balcony rail hookups, house sound system, backstage paging system (if any), dressing rooms near the stage with chairs, lights, mirrors, make-up tables, hot and cold running water, hanging facilities for costumes, accessible lavatory facilities and musicians' lounge if available) in good condition and in accordance with the provisions of this Agreement, the appropriate governmental laws, licenses and regulations and in accordance with the Actors' Equity Safe and Sanitary Code. The Theatre Lease must meet all terms and conditions as specified in the attached technical rider. The Theatre Lease must also provide for the Theatre to furnish an electrical power supply separate from the Theatre's house lighting and other electrical systems adequate for the operation of Producer's sound, lighting and automation equipment as set forth in the attached Technical Rider.

3.  During the Term, Producer's employees and representatives shall have full access to all areas of the Theatre as set forth above, but except as expressly provided herein, the Producer shall have no control over the actual operation of the theatre or over any operating personnel employed or utilized by Presenter. The control of all entrances and exits shall be solely exercisable by the Presenter and Presenter shall furnish adequate security for the observance of the following restrictions: No one shall enter any stage areas or