## MAMMA MIA! – SAN BERNARDINO, CA

dressing rooms or audience areas except persons engaged by the Producer, the Presenter or the Theatre owner in connection with the operation of the Theatre, and, in the case of the audience areas, except members of the audience holding tickets for admission.

   4. Notwithstanding the fact that the Theatre Lease may include provisions for the facilities, services and personnel required for the presentation of the Attraction, the Presenter shall nonetheless bear primary responsibility for insuring that the provisions of this Agreement are fully complied with by the Theatre.

b) If any of the above facilities, services and personnel required for the presentation of the Attraction are not directly furnished by the Theatre in accordance with the provisions of the Theatre Lease, Presenter shall nonetheless furnish the required facilities, services and personnel and shall directly pay all local expenses and costs incurred in connection therewith including but not limited to the following:

   1. All local preliminary and weekly operating general and administrative costs of the Presenter and the Theatre for the presentation of the Attraction including all costs associated with subscription, group and single ticket advertising and ticket sales, pre-approved local press agent and Presenter staff, Theatre cleaning and customary and required maintenance and repairs, the preliminary and weekly operating costs of the box office including box office personnel, and subscription, telephone, group sales, and mail order sales clerks and staff, front of house personnel, security personnel, and all other personnel required to be engaged locally (plus applicable taxes and fringe benefits).

   2. All preliminary theatre expenses including salaries of local stagehands and/or housemen (plus applicable taxes and fringe benefits) for the spotting of lines and electrical pre-hang and preparation, clearing or "stripping" and restore of all scenery, drops, drapes, lighting equipment, motion picture screens, orchestra shells and "clouds" and any extraneous equipment, materials and props from the stage floor and stage wings, lines and fly system, electrical system, orchestra pit area, auditorium and dressing rooms and in all ways technically prepared for the load-in and technical and orchestra readings and rehearsals, all as required by Producer, and/or as set forth in the attached Technical Rider, in order to properly present the show. Presenter agrees to provide for any necessary parking and/or parking permits and/or Nominee (and will notify Producer or complete on the Producer's behalf any applications necessary) and to have all truck approaches to the Theatre loading dock free and clear of other vehicles or any extraneous materials so as to permit direct and unhindered approach of Producer's trucks.

   3. All costs of load-in and load-out including salaries of local stagehands, wardrobe attendants, housemen, security personnel, stage door personnel, teamsters and loaders for the Producer's trucks (plus applicable taxes and fringe benefits), and any equipment rentals as required by Producer, the repacking of empty crates into the Producer's trucks if Theatre cannot provide adequate storage, any restoration to Theatre that may be required to Theatre and any catering required by applicable rules and regulations or in the event of a "round-the-clock" load-in.

   4. All expenses associated with providing local musicians including the local musical contractor as set forth in the attached Technical Rider, or any additional musicians or "walkers" who are required to be hired pursuant to local musicians union rules or regulations.

   5. All local costs related to work calls and any technical rehearsal prior to the opening night of the engagement as required by the Producer and/or set forth in the attached Technical Rider (including orchestra reading and rehearsals plus orchestra sound checks, as scheduled by the Production Stage Manager or Musical Director, technical and stage, sound and lighting checks and/or rehearsals).

   6. All local costs related to performances of the Attraction to include sound and lighting checks commencing one hour before opening of the house, and all pre-sets, one hour of wardrobe pre-set, wardrobe and hair daywork (up to 64 hours per performance week), the salaries of local stagehands, wardrobe & hair attendants (including dressers), housemen, local musicians, ADA personnel (and expenses as necessary), security personnel, stage door personnel, ushers, ticket takers, house manager, technical director (if included

## MAMMA MIA! – SAN BERNARDINO, CA

in yellow card), porters, cleaners, janitors, matrons, and other theatre personnel plus applicable documented taxes and fringe benefits.

7. All costs associated with providing all elements, materials and equipment and complying with all the terms of the attached Technical Rider necessary to accommodate the physical demands of the production.

8. Presenter agrees to adhere to and abide by the applicable rules, regulations and requirements of all unions having jurisdiction over the performances hereunder and all personnel provided by Theatre or Presenter shall be members, in good standing, of any union having jurisdiction in the state in which performances of the Attraction hereunder are to be presented, and shall be subject to Producer's supervision during the load-in, rehearsal calls, performances, and load-out of the Attraction. Producer's complaints, if any, concerning personnel furnished by Presenter shall be submitted to Presenter, and both parties shall use their best efforts to resolve any conflict.

9. Presenter shall furnish to Producer not later than Eight (8) weeks prior to the first performance hereunder, copies of all local collective bargaining agreements, union rules and regulations, salary scales and rates and union fringe benefits applicable to the required local personnel for the performances hereunder.

10. Presenter agrees that all local personnel shall be subject to Producer's supervision during load-in, rehearsals, work calls, immediately before, after and during all performances and load-out and shall comply with technical and production requirements as specified by the Producer but who shall in no event be deemed employees of Producer.

11. Presenter shall, at its own expense, provide or arrange for Theatre to provide a printed program to distribute free to each and every member of the audience for all performances hereunder. Producer shall provide the copy for the program no later than Four (4) weeks prior to the first performance hereunder. Presenter agrees to print the program in its entirety and exactly in the format provided by Producer. Presenter shall be liable for any failure to comply with this provision with the exception of any casual or inadvertent omission(s) or alteration(s), which shall promptly be remedied by Presenter.

12. Presenter agrees that if any of the requirements or conditions of this Paragraph 6 or the Technical Rider have not been duly met, fulfilled or complied with by Presenter at the times provided for, or in the event the Presenter fails to provide the personnel required by Producer, then Producer shall have the right to do what the Presenter has failed to do and Presenter agrees that the Producer's representative may, at the Presenter's sole expense, provide for such requirements or conditions and/or may engage at the Presenter's sole expense those additional personnel required at reasonable and customary rates.

13. Telephone lines shall be provided by Presenter, and paid for as a Local Documented Expense.

 Concessions and Souvenir Programs

Immediately prior to and after each performance and during intermission, Producer shall have the sole right to sell souvenir programs and show merchandise supplied by the Producer in the theater lobby, subject to the theater concessionaire's requirements, if any. Producer shall negotiate directly with the Theater concessionaire to determine merchandising commissions. **SEE** CALIFORNIA THEATRE CONCESSION FEE IS 20%

 Advertising and Publicity

a) Producer agrees to furnish a complete press kit plus a reasonable quantity of heralds and window cards. Presenter agrees to follow the Producer's instructions and properly imprint, distribute and display all materials without alteration. Producer also agrees to furnish, if available, prerecorded television and radio commercials. Presenter agrees to use only the press materials, heralds, window cards, photographs, television and radio commercials furnished by Producer in accordance with Producer's style guide which shall be furnished with press materials. Presenter agrees that all such materials and commercials shall be

## MAMMA MIA! – SAN BERNARDINO, CA

used only for the purpose of advertising the Attraction, and shall be returned to the Producer immediately upon completion of the engagement. Presenter agrees that Producer shall have the right to approve the contents of all advertising and publicity materials. Presenter shall contact Producer for approval of any advertising and/or publicity materials Presenter wishes to modify or alter (with the exception of localization (theatre name, local sponsor, ticket information, etc)). Presenter agrees to indemnify Producer by reason of Presenter's breach of the provisions of this paragraph. In the event Presenter alters, omits, adds to or does not print any of the billing or other program copy or other copy as provided by the Producer, Presenter shall be liable for any penalty or liability imposed upon the Producer by all third parties including Actors' Equity Association provided proper notification of such breach has been received by Presenter and remedy of such breach shall be at Presenter's sole expense. ~~if~~ ~~presenter has given~~ reasonable time to resolve the issue (DMC)

b) Presenter agrees to pay for all advertising expenses, and publicity services of any type required for the proper fulfillment of the engagement (including Advertising Agency commissions). Advertising commissions are limited to a maximum of Twelve Percent (12%) on Print advertising and Ten Percent (10%) on Electronic advertising. Such commission will be a local documented expense. It will be amortized over the playing weeks. Not later than ~~eight weeks prior to the first performance but in no event less than four (4) weeks prior to the desired on-sale date,~~ Presenter agrees to submit the advertising budget, advertising plan, and the advertising schedule for Producer's approval. Advertising expenses will be reimbursed only for documented print, radio, outdoor, and television advertising expenses for single ticket sales, (including production costs). No other expenses (including but not limited to any costs whatsoever for advertising and/or direct mail for subscription and group sales solicitation, web-site hosting fee, program, press agent fees and expenses, etc.) shall be considered allowable advertising expenses. All such expenses must be based on actual cost and be fully documented, with bills (affidavits) from stations for all radio and television advertising, and bills from all print media and others, and tear sheets for print advertising. All bills must be submitted by ~~Friday~~ Sunday of each performance week herein at noon.

c) Presenter agrees to consult with, and obtain approval from, the Producer (or Producer's representative) for all media buys, trades and all facets relative to the proper promotion of the Attraction. Producer's logo, art and/or lyrics for the Attraction may not be used for publicity without prior written approval of Producer.

d) Press requests for appearances and interviews of any member of the company must be approved by Producer (or Producer's representative). Any union payments, if required, for said appearances shall be paid by Presenter.

e) Presenter will comply with all advertising and billing requirements of Producer. Trade advertising shall be disclosed and pre-approved by Producer. All local sponsorship requests must be disclosed upon the submission of ticket scales. Producer has the right of approval over any sponsorship requirement that directly affects the Attraction (ticket requirements, lobby displays, inclusion in advertising, etc.), and such approval shall not be unreasonably withheld with prior disclosure. Producer shall also disclose any national sponsorships that may affect the local market (ticket requirements, inclusion in advertising, product exclusivity, etc.) in a timely manner.

f) ~~Presenter agrees that no other Attraction shall have more favorable advertising placement or larger advertising space inside or outside the Venue (including Venue's marquee) during the full run of the engagement for this Attraction (including but not limited to any dark time prior to opening of this engagement).~~ SEF (DMC)

9. Taping of Show

Presenter agrees to prevent the broadcasting, recording, transmission, photographing, or any other transmission or reproduction of any rehearsal or performance(s) or any part thereof by any means or media now or hereafter known including but not limited to audio, visual, or audio-visual means except for authorized opening night news footage. Presenter further agrees the Attraction shall be presented without

## MAMMA MIA! – SAN BERNARDINO, CA

any pre-show activities or ceremonies and/or any other performer or other Attractions being presented herewith.

### 10.  Price Scale; Accounting and Ticket Sales

a) From the date tickets go on sale through the close of the run, by 2:00PM (EST) each business day, the daily box office wrap must be called or faxed to The Booking Group: Phone (212) 869-9280; Facsimile (212) 869-3028.

b) Producer shall be supplied with a manifest and seating diagram (with actual numbered seats and location of all seats to be made available for sale). Presenter will arrange and provide facilities for the sale of tickets to all scheduled performances through box office, outlets, telephones, subscriptions, group mail order and credit cards. Presenter warrants that there are not any seats which are not listed on the manifest that have been sold or are available for sale to any patrons in any form whatsoever, including but not limited to corporate suites or boxes or seats that have been given to a sponsor in exchange for sponsorship dollars except as otherwise agreed to in writing.

c) Presenter shall keep and maintain detailed, accurate books and records corresponding to the sale of all tickets and gross receipts hereunder, expenses properly chargeable to Producer hereunder, and expenses chargeable to Presenter hereunder (including documented advertising expenses). Producer's representative shall have access to and the right to make copies of such records at all times and shall have free access to the box office during all regular business hours during the Term.

d) The receipts of each performance shall be ascertained by the statement of the sales of the box office provided to Producer no later than intermission of each performance hereunder and all other points of sale and may be verified for each and every performance by the Producer, if desired, by the count of the tickets taken at the door and placed in a secure box. Except for members of the press and other media which shall be limited to opening night (and must be approved by Producer's Representative), neither Presenter nor Producer shall furnish free tickets or admission to the performances unless mutually agreed upon, such approval not to be unreasonably withheld. ~~All discounted tickets must be stamped or clearly marked with the actual price. All complimentary tickets must be stamped or clearly marked complimentary or shall indicate a zero ($00.00) ticket price.~~ Presenter shall use best efforts to prevent misuse of tickets; tickets may not be sold for more than face value. ~~These tickets are provided to Presenter after their distribution such tickets~~  *Press rep has approve 120 trade comps.* (PW)

### 11.  Producer House Seats and Complimentary Tickets

Presenter agrees to hold *10* ~~25~~ pairs of house seats for Producer's purchase for each performance in rows *7* ~~16~~-15 of the center section of the orchestra. Such seats not specifically allocated by the Producer or his representative forty-eight (48) hours prior to the performance may be released with the provision that two (2) pairs of house seats be held until two (2) hours prior to performance. House seat orders shall be exempt from service charges in excess of normal facility fees (where applicable).

All tickets held off-sale for any reason by Presenter shall be disclosed and approved by Producer and a release/ payment policy shall be mutually agreed upon.

### 12.  Impossibility of Performance

a) If a member of the Attraction cannot perform because of ill health, physical disability, or other circumstances not reasonably within Producer's control, Producer shall use its commercially reasonably efforts to furnish a substitute for such member and Producer shall not be liable for the failure of such member to perform nor shall Presenter be relieved of any of its obligations herein, provided the performance is given in its entirety.

## MAMMA MIA! – SAN BERNARDINO, CA

b) Force Majeure: In the event that the performance of any of the provisions of this Agreement on the part of the Producer or Presenter shall be prevented or interfered with by an act of God, fire, national or local calamity, death or physical or other disability of any of the personnel forming part of or used in connection with the Attraction, the acts or regulations of any public authority or labor union, labor difficulties, strike, war, epidemic, storm or inclement weather, or any other cause that renders such performance impossible, such party shall be relieved of its obligations hereunder with respect to the performance(s) so prevented because of such cause, unless the obligations are covered by insurance and then only to the extent of the insurance proceeds available for such obligations. If any performance shall be prevented for any of the foregoing causes neither the Presenter nor Producer shall be under any obligation to present the Production at a different time.

c) In addition, Producer may in its discretion cancel any performance which may expose any member of the company or any portion of the audience to danger of death, disease or injury or to any outbreak of violence or civil strife. Upon such a termination, Producer shall not be liable to Presenter for any loss, damage or expense claimed to have been suffered by Presenter as a result of such termination, but where the condition upon which such termination is based shall not have been caused by Presenter or shall not have been reasonably foreseeable by Presenter, Producer shall return any monies previously deposited with Producer hereunder, after deducting only the actual and direct costs incurred by Producer in connection with such terminated performance.

d) If the Producer elects to terminate the run of the Attraction and posts a notice to that effect, the Producer simultaneously therewith shall advise the Presenter in writing of such action and shall have no further liability except to: (i) return any advance on the Guarantee which has been paid; and (ii) reimburse the Presenter for any actual documented expenses, as may be reasonable and customary, approved by the Producer and incurred prior to such notice by the Presenter in connection with the performances scheduled, but not performed, due to such termination.

13.    Insurance Requirements

a) Presenter agrees to defend, indemnify and hold harmless Producer from and against all liability claims for bodily injury or property damage in connection with or in relation to any actions, claims, or demands by third parties, solely based upon any acts, defaults, or neglects of Presenter and/or its employees and/or agents and/or independent contractors.

b) Producer agrees to indemnify and hold harmless Presenter from and against all liability claims for bodily injury or property damage in connection with or relating to any actions, claims, or demands by third parties, solely based upon any acts, defaults, or neglects of the Producer and/or its employees and/or independent contractors.

c) Producer and Presenter agree to carry and maintain in full force and effect Worker's Compensation Insurance and Unemployment Insurance as required by law or union contract on all of Producer's and Presenter's employees respectively, Public Liability insurance and Non-Owned and Hired Automobile Insurance with minimum limits of $$,000,000.00 and to furnish a Certificate of Insurance verifying such coverage upon request.

d) Presenter agrees to name Producer as an Additional Insured on the Public Liability policy pertaining to this engagement and to furnish a certificate verifying the insurance and the listing of Producer upon request.

14.    Terms of Contract

a) Nothing contained herein shall be deemed to create or constitute a joint venture, partnership, or trust relationship between the parties.

## MAMMA MIA! – SAN BERNARDINO, CA

b)  This Agreement contains the entire understanding of the parties, shall be amended or modified only in writing signed by both parties and shall be construed, governed and interpreted pursuant to the laws of the State of New York applicable to agreements wholly to be performed therein. Presenter shall not have the right to assign this Agreement or any of Presenter's obligations hereunder. Producer shall have the right to assign this Agreement or any of Producer's obligations hereunder to any party.

c)  All notices to Presenter and Producer shall be in writing addressed to their respective address set forth herein.

### 15.  Remedies

If on or before the date of any scheduled performance Presenter has failed, neglected, or refused to perform any material obligation pursuant to any Agreement with any other producer, theatrical production or performer, or if the financial standing or credit of Presenter has been impaired then Producer shall have the right to (i) demand that Presenter furnish Producer with a Letter of Credit in an amount equal to the guaranteed and anticipated compensation due to Producer hereunder and in a form and substance, for a irrevocable drawn on a bank acceptable to the Producer, and/or (ii) demand that Presenter immediately pay to Producer any and all guaranteed compensation due to Producer hereunder. If the Presenter breaches or defaults in the due performance of any of its material warranties, or agreements hereunder (and any of such events shall hereinafter be deemed an "Event of Default"), then Producer shall have the right to terminate this Agreement and its obligations hereunder. The Presenter agrees that in such event Presenter shall nonetheless immediately pay any and all sums due and payable to Producer as set forth in this agreement as Compensation (including but not limited to the Guarantee) and that any and all sums previously paid to Producer shall be retained by Producer as liquidated damages, and that Producer shall immediately have the right to present for payment any Letter of Credit furnished it for payment and receive payment thereon for any and all guaranteed and anticipated compensation due to Producer hereunder. If Presenter fails or refuses to provide such Letter of Credit and/or make such payment within Forty Eight (48) hours of written notice of such demand(s) from Producer then this failure or refusal by Presenter shall be deemed an "Event of Default" and Producer shall have the right to proceed as set forth immediately above.

### 16.  .  Indemnity

a)  Notwithstanding any other provision of this Agreement, the Presenter will indemnify, defend and hold harmless Producer and its parent, affiliates, and subsidiaries and their respective officers, agents, employees and representatives from and against any and all claims, liabilities, losses, damages, injuries, demands, actions, causes of action, suits, proceedings, judgments and expenses, including, without limitation, reasonable attorneys' fees, court costs and other legal expenses arising from or connected with (i) any alleged or actual breach by Presenter of any provision hereof or the inaccuracy of any warranties or representations made by Presenter herein (ii) any acts or omissions by Presenter except to the extent that any claim is caused by any negligence or willful misconduct of the Producer.

b)  Notwithstanding any other provision of this Agreement, the Producer will indemnify, defend and hold harmless Presenter and its parent, affiliates, and subsidiaries and their respective officers, agents, employees and representatives from and against any and all claims, liabilities, losses, damages, injuries, demands, actions, causes of action, suits, proceedings, judgments and expenses, including, without limitation, reasonable attorneys' fees, court costs and other legal expenses arising from or connected with (i) any alleged or actual breach by Producer of any provision hereof or the inaccuracy of any warranties or representations made by Producer herein (ii) any acts or omissions by Producer except to the extent that any claim is caused by any negligence or willful misconduct of the Presenter.

### 17.  Arbitration Procedures/ Governing Law/ Jurisdiction

Any claims, dispute, or controversy arising out of or relating to this agreement shall be submitted to arbitration in Manhattan, New York before one arbitrator pursuant to the rules then applicable of the

## MAMMA MIA! – SAN BERNARDINO, CA

American Arbitration Association. Judgment on any award rendered pursuant to such arbitration may be entered in any court, state or federal, having jurisdiction, the prevailing party in the arbitration being entitled to all costs including reasonable attorney's fees.

18.    **Right To Audit**

Presenter shall maintain and keep at its address above set forth for at least twelve (12) months after the final performance of the Attraction all data and accurate records of all ticket sales, local expenses, advertising expenses, yellow card expenses, and vouchers and receipts relating thereto. Producer's representative shall have the right to audit, inspect and copy the books and records of the Presenter with respect thereto during the presentation of the Attraction and within twelve (12) months after the last performance of the Attraction. The Presenter agrees to cooperate with the Producer's representative with respect thereto. If the Presenter does not own the theatre or have a long-term lease, the Presenter should provide Producer or have available for inspection a true and accurate copy of Presenter's lease agreement with the theatre.

It is expressly understood by both parties that THE BOOKING GROUP acts only as disclosed agent and assumes no liability hereunder. In the event of any claims by or between the Producer and/or Presenter, THE BOOKING GROUP may not be named as a party to any arbitration or litigation nor shall be directly or indirectly responsible for the claims, obligations, responsibilities or liabilities of the Producer or Presenter, whether or not arising in connection with this agreement or otherwise.

By its signature hereunder, Presenter agrees to the terms of this contract and acknowledges that Schedule "A" (Ticket Prices and Gross Potential), Schedule "A2" (Ticket Commissions and Discount), Schedule "B" (the Presenter's Local Expenses), and the Technical Rider containing additional terms and provisions necessary to the presentation of the Attraction are attached hereto and are integral parts of this Agreement.

This constitutes the entire Agreement, which may not be modified, unless in writing by both parties.

AGREED AND ACCEPTED:

PRESENTER
THEATRICAL ARTS INTERNATIONAL

by _____

title: PRESIDENT          date 2/16/2006

PRODUCER
MAMMA MIA USA TOUR 2, LP

by _____          date 2/16/06
David Kredell, General Manager

Page 11

# EXHIBIT A

----Original Message----
To: Devin Kendell; Tom Capps; Htorell@aol.com
Sent: Fri Dec 30 00:14:45 2005
Subject: San Bernardino-California Theatre

Hi all.
Here are the highlights of the Survey trip on Thursday, 12.22.05.

•There is no space inside the theatre for the following:
   Quick-change gondolas
   Wardrobe gondolas
   Make up tables
   Wardrobe and Hair
   SM, CM workboxes
   Road Crew workboxes
   Band equipment boxes

We will need to rent three 40'trailers and one 20'trailer.  Two of the 40'trailers will be positioned US of the back wall of the theatre and they will be our Quick-change areas – one for the men and one for the women. We will also fit a small table in each to serve as the hair and makeup stations. These two trailers will be delivered on Tuesday morning so that the loading door is accessible for the load in on Sunday and Monday.

The third of the 40'trailers will live SL of the theatre and house Wardrobe and Hair – we will be in the middle of getting ready for our cast changeover so this space will be tight.

The 20'trailer will be SR of the theatre and will be used for the CM workbox, SM workbox, Make-up bins, Equity cots and any other necessary boxes.

We will need to fence around these trailers but some of the fences will have to be moveable as the doors to the rear of the theatre are exits for the audience.

We will need to hire security 24/7 as the trailers will have cables for program feed and paging and they will not be completely secure.  The area around the theatre is not the best.

We will have to put a tarp from the back of the theatre to the trailer to cover the walkways in and out of the theatre.

We can store one of our Mamma Mia trailers in the parking lot adjacent to the theatre to backload empties.

•The grid is wooden including the well beams.
We would like a structural engineer to sign off that the weight of our show is safe.  John is putting together a document that has all of the weights of our show.  He will email that to Allen Evenson today (Thursday, 12.29).

•Even if the grid is structurally sound for our show, John does not feel comfortable running the trusses in at the end of the show.  Other flying elements may be compromised.

•The show deck will fit into the theatre.  If we cut the ground row we will have a narrow crossover inside the building.

•The service trusses will be in the air – there is a steel beam where we can hang them extreme SR.

•The vocal booths will have to go SL – it will be tight and we will have to address some traffic issues. There will be an open door to the outside (this is how we will access the "Quick change trailers" that will be in the alley outside of the theatre) and we could potentially pick up any noise like sirens, car horns or people walking by in the vocal booth microphones.

•We would like to have a two day Advance.
    Sunday, February 19    8:00am-5:00pm    advance
    Monday, February 20   9:00am-2:00pm    advance
                          3:00pm-7:00pm    Road crew – Load-in
                          8:00pm-12:00am   Continue Load in
    Tuesday, February 21  8:00am-5:00pm    Continue Load in

•In the pit we will have to remote percussion, the drums left, and 1 keyboard to the room in the basement. The only access to that room is down 7 steps.

•The hallway outside the pit and leading down to the pit will have to be cleared of everything in order for gear and musical instruments to be moved into the pit.

•The pit equipment and RF rack will live in a room off House right. Band gear equipment will have to be stored outside somewhere or back loaded onto a trailer.

•We will have to run paging system and program monitors into the trailers outside the theatre.

•The FOH mix position is adequate and the FOH lightboard position is adequate.

•Electrics and Automation will have enough room SR – Allen will make sure that the hallway off SR and room DR are cleared for us.

•There are no washers or dryers or hookups. All laundry will have to be taken to a laundromat.

•The dressing room space will be very tight. We will have to add additional stations into the dressing rooms on the second floor SR. The access to all dressing rooms is via stairs.

•There is a small room DSL that will be used for a quick-change room for Sophie – I think we will only need it for her change before the Wedding. None of the dressing rooms are far in a theatre this size!

•We will have some seat kills – the house has 1700 seats and it is wide. I anticipate having to mark 100 seats (conservative estimate) either obstructed or not available.

I think that is all for now. The space is incredibly tight for us – needless to say. It will be very trying at best and it will be like nothing we have ever done before. I am sure once the show is in the space it will look great – it is a beautiful theatre it is just way too small for us. Allen Evenson is our contact there and he has been incredibly accommodating in trying to help us fit in the theatre. Once we have confirmation that the structural engineer has signed off on the wooden grid I will let everyone know.

Best,
Beth

02/17/2006  13:07    3236555154              HARMONY ARTISTS        PAGE  01
12/26/2005  82:28    9092444354              EVENSON                PAGE  1a
01/26/2006  23:37    9898858672              THEATRICAL ARTS        PAGE  14/26

| MAMMA MIA! | SAN BERNARDINO, CA |
| FEBRUARY 21 - 24, 2006 | CALIFORNIA THEATRE |

|              |       |      |
| ------------ | ----- | ---- |
| Monday       |       |      |
| Tuesday      |       | 8:00 |
| Wednesday    |       | 8:00 |
| Thursday     |       | 8:00 |
| Friday       |       | 8:00 |
| Saturday     | 2:00  | 8:00 |
| Sunday       | 2:00  | 7:00 |

House Capacity per show        1573

**Price Sched A:**        **ALL PERFORMANCES**
| 158 | seats @ | $75.00 | $12,600.00 |
| 1273 | seats @ | $65.00 | $82,745.00 |
| 60 | seats @ | $50.00 | $3,000.00 |
| 77 | seats @ | $38.50 | $2,964.50 |

$101,309.50

TOTAL # PERFORMANCES PER WEEK        8

TOTAL POTENTIAL GROSS PER WEEK        $810,476.00

TOTAL GROSS AFTER TAX PER WEEK        $810,476.00        0.00%

AGREED AND ACCEPTED:

PRESENTER                               PRODUCER
THEATRICAL ARTS INTERNATIONAL           MAMMA MIA USA TOUR 2, LP

by                                      by

The    PRESIDENT                        Devin Kendall, General Manager

Date    2/16/2006                       Date    2/14/06

THE BOOKING GROUP        SCHEDULE A        TICKET PRICES & GROSS POTENTIAL

12/28/2005  02:28   9092444354                    EVENSON                          PAGE  16

61/26/2006  23:57   9890058672                THEATRICAL ARTS                      PAGE  15/26

**MAMMA MIA!**
**FEBRUARY 21 - 26, 2006**                    SAN BERNARDINO, CA
                                              CALIFORNIA THEATRE

|          |        |      |
|----------|--------|------|
| Monday   |        | 8:00 |
| Tuesday  |        | 8:00 |
| Wednesday|        | 8:00 |
| Thursday |        | 8:00 |
| Friday   |        | 8:00 |
| Saturday | 2:00   | 8:00 |
| Sunday   | 2:00   | 7:00 |

House Capacity per show:                      1973

TAX:                                0.00%

BOX OFFICE COMMISSIONS:

| Phones              | 6% |
| Credit Cards        | 6% |
| Internet            | 6% |
| Remotes/Outlets     | 6% |

REMOTES, PHONES & INTERNET ARE INCLUSIVE OF CREDIT CARDS

*Press rep has approved 120 trade comps*

THERE SHALL BE NO COMPLIMENTARY TICKETS ALLOWED WITHOUT WRITTEN APPROVAL
FROM PRODUCER'S REPRESENTATIVE.

PRESENTER                                     PRODUCER
THEATRICAL ARTS INTERNATIONAL                 MAMMA MIA USA TOUR 2, LP

by                                            by
Title  PRESIDENT                              Devin Keudell, General Manager

Date  2/16/2006                               Date  2/16/06

THE EXCESSIVE GROUP          SCHEDULE A2          TRADE/DISCOUNTS & COMMISSIONS

12/26/2005  02:26    5652444354                    EVENSON                    PAGE  16

01/26/2006  29:37    9898858872                    THEATRICAL ARTS            PAGE  16/26

MAMMA MIA!                              SAN BERNARDINO, CA
FEBRUARY 21 - 26, 2006                  CALIFORNIA THEATRE

LOCAL FIXED PER WEEK
   Box Office
   Catering
   Cleaning
   Direct Mail
   Group Sales Expenses
   Houseman/TD
   House Staff
   In-House Equipment Rental
   League Fees
   Licenses/Permits
   Lines/Auto
   Opening Night
   Piano Rental/Tuning
   Police/Security
   Program
   Public Relations
   Rent
   Ticket Printing
   Utilities

SUBTOTAL PER WEEK

LOCAL AND ADDITIONAL PER WEEK
   Advertising                          (Amortized)
   TBD    ATM Service
   TBD    Labor Catering
   TBD    Stagehands & Loaders ESTIMATE
   TBD    Truck Rental for Travis Delivery
   TBD    Wardrobe/Hair
   TBD    Expenses as necessitated by local conditions as outlined on EXHIBIT A

SUBTOTAL PER WEEK

TOTAL LOCAL EXPENSES PER WEEK

AGREED AND ACCEPTED:

PRESENTER                               PRODUCER
THEATRICAL ARTS INTERNATIONAL           MAMMA MIA USA TOUR 2, LP

By                                      By
Title  PRESIDENT                        Devin Keudel, General Manager
Date   2/10/2006                        Date   2/16/06

PAGE 01                      HARMONY ARTISTS

## MAMMA MIA! – TOUR #2

### Technical Requirements
### (Rider Dated 5/4/04)

*In the following pages, we will outline for you the technical requirements for the touring production of "Mamma Mia!" Your cooperation and advance preparation will facilitate an efficient load-in, set-up, run and load-out. We hope to cover all areas of concern, but if you have additional questions after going through this document please feel free to contact us with further questions.*

## MINIMUM STAGE REQUIREMENTS

Minimum proscenium width opening:    40' 0"  (20' 0"  left and right of center)
Minimum stage depth (from first working set): 27'0  32'-0"
Minimum stage width:    71    74'0"  (37' 0" left and right of center) 34' and 37'
Minimum grid height:    65' 0"
Minimum width between fly floors:    64' 0"  (32' 0" left and right of center)    69
Minimum height clear under fly floors:    26' 0"
Minimum size loading door:    8' 0" wide X 9' 0" high

## SEATING HOLDS

Sound console:  See Sound Department
Followspots:  See Electrics Department
Electrics Console:  See Electrics Department

Sightlines:    See Sound Department (Towers)

## GENERAL REQUIREMENTS

1.  Please mail a copy of current local union contracts to the New York office mailing listing the prevailing local union rates at least six (6) months prior to the engagement.

2.  Please fax or mail a copy of the current hanging plot (line set positions) to the New York office as soon as possible.  Fax (212) 221-3222.

3.  Please mail a complete and detailed ground plan and section on the stage and house (in scale) to the New York office as soon as possible.  Also, please include a copy of the dressing room layouts.

4.  We require the following for both the in and out:

    1 - 2 ton 6' forklift & qualified operator (2 if required by local conditions i.e. no level truck dock).  Must be there with arrival of 1st truck.
    1 - 36' genie lift
    1 - truck rental for delivery of trunks per Actors' Equity Association regulations.

5.  It is imperative that all areas of the stage, fly system, backstage, loading docks, dressing rooms, storage areas, orchestra pit, and productions offices be completely clear and broom clean prior to the start of the advance load-in.  Strip all lighting equipment from Box booms 1 and 2, as well as the balcony rail (or cove).

1

6.  All personnel called for the load-in, load-out, and performances of the production must be qualified in their department and prompt for the starting times of all calls. ALL STAGEHANDS EMPLOYED ARE EXPECTED TO BRING BASIC TOOLS. (I.E. A HAMMER, PHILLIPS SCREWDRIVER, SLOTTED SCREWDRIVER, CRESCENT WRENCH, PLIERS, AND A TAPE MEASURE.)

7.  ANY STAGEHAND SHOWING UP FOR WORK OR SHOW CALLS SHOWING ANY SIGNS OF DRINKING OR SUBSTANCE ABUSE WILL BE DISMISSED ON THE SPOT.

8.  It is expected that when a stagehand begins working in one department that the stagehand will continue in that department for the duration of load-in. Further, it is expected that when a stagehand accepts a job on the running crew that said stagehand will remain on the job for the duration of all performances.

9.  Some stagehands will be required to wear black clothing in order to avoid being seen while in the wings.

10. This production travels in eight (8) 53-foot tractor-trailers, plus 1 advance tractor-trailer. For the load-in and load-out please arrange to have all available parking spaces in the immediate area of the loading dock clear and available for trailer parking and unloading. It is extremely important that the movement of the trucks not be obstructed by cars parked on the streets and lots surrounding the theatre. Should it be necessary for our trucks to block streets or impede local traffic in any way, it is the local presenter's responsibility to arrange for required permits, reserve parking spaces, and/or hire any metropolitan police detail (if required). 

11. A portion of the running crew will be called to work up to one and one-half (1 1/2) hours prior to each show to preset the stage while others will be called at half-hour.

## CARPENTRY DEPARTMENT

## IF YOU ARE UNABLE TO COMPLY WITH ANY OF THE FOLLOWING REQUIREMENTS, PLEASE NOTIFY US IMMEDIATELY.

1.  FLY SYSTEM AND THE STAGE AREA MUST BE CLEARED OF ALL SCENERY, ELECTRICS, DRAPES, BAND SHELLS, SCENERY AND PROJECTION SCREENS PRIOR TO THE LOAD IN. THIS IS ABSOLUTELY ESSENTIAL.

2.  The orchestra pit will be used by our (9) traveling musicians. Please ensure that it is clear and ready to accommodate our band equipment.

3.  There must be 5500 lbs. of weight, over pipe weight, available on the loading gallery before the arrival of the production. This weight is doubled (11,000 lbs. over pipe weight) in a double purchase house.

4.  Carpenter must be able to lag into deck, which must be level and structurally sound.

5.  ~~Linesets must be biddable.~~

6.  We require no less than 30 spotted lines with 2 wheels per line and a commensurate amount of 5/8" hemp, available at the time of the advance spotting call.

2

7.    A phone line should be made available backstage for the Automation Carpenter for the run of the show. This line should have access to long distance via a 1-800 number.

## ELECTRIC DEPARTMENT

1.    POWER REQUIREMENTS

    A.    **AUTOMATION REQUIRED POWER:** 1 200-amp 208VAC 3-phase Y power with ground and neutral. Power should be fused and have a disconnect switch with lugs.

    B.    **LIGHTING REQUIRED POWER:** Two (2) 400-amp 3-phase 5-wire with ground switches. Power needed within 50' of Dimmer Rack Location. Rack location to be downstage right.

    C.    **SOUND REQUIRED POWER:** Unique (AUDIO ONLY) 3 phase 200 Amp service with isolated ground - may not be shared with any other powered systems (i.e. Dimmers, Automation Motors, Air Conditioning etc.). Power needed within 50' of Amplifier Racks. Rack location to be determined by Road Sound Operator.

    House power feed must maintain a minimum of 208 volts and be configured in a "Y" phase. If the voltage drops below 208 volts, the computer controlled motor effects may not work properly. The production requires a 'cold water pipe' or earth ground. If a cold water pipe is provided, it must be a filled pipe. A standpipe is not acceptable. If the power feeds do not terminate in a location as specified above it is the responsibility of the local presenter to provide the necessary feeder cable, etc. to insure that the power feed terminates as specified.

2.    Before the start of the load in, all on-stage electrical pipes, box booms 1 and 2, and balcony rail or cove must be cleared of instruments and their raceways and feed cables.

3.    Please supply the New York office with any local electric restrictions or codes. If specific permits are required, it is the responsibility of the local presenter to secure these permits prior to the start of the load-in.

4.    The local presenter must provide one 20 amp non dim circuit in pit for music stand lights.

5.    The production requires the presenter to provide three (3) color-balanced 2kw (or 2.5kw) Lycian Followspots, or three (3) matched Strong 2 kw (or 2.5kw) Xenon Super Trouper followspots. Each followspot must put out a minimum of 200 foot candles. This measurement should be taken at the plaster line. Followspots should be central at the rear of "High Balcony" level, in a soundproof booth. Audience heads/hands should not interfere with followspot beams when audience stands in the back row. These followspots must be in position and checked that they are in good working order prior to the load-in and can in no way be part of the load-in work calls. The touring electrician will check the followspots to make sure of their condition. Any work he deems necessary will be at the cost of the local producer. A spare lamp must be included in case of lamp failure.

6.    We require an area approximately 6 feet deep and 8 feet wide for our lighting consoles with a clear view of the stage. This may be set up a tech booth or in the back of the orchestra seating. If no such space is available for this position, seats may need to be removed to accommodate it. Please discuss this with the production staff in advance.

3

7.  This production utilizes the following positions:

   * Balcony Rail
   * Near Box Boom
   * Far Box Boom

   Balcony rail and far box booms can be installed in a cove. If adequate positions do not exist, they will need to be installed. Please discuss with the production staff in advance.

8.  In some theatres, we will be hanging service trusses SL and SR – 4 points each. The points must hold 1,500 pounds. Service truss weighs approximately 4,000 pounds.

9.  We require 200 lbs. of dry ice per performance. Dry ice must be cut in slabs. A storage container must be provided, large enough to store all required dry ice.

## SOUND DEPARTMENT

   **SOUND REQUIRED POWER:** Unique (AUDIO ONLY) 3-phase 200 Amp service with isolated ground - may not be shared with any other powered systems (i.e. Dimmers, Automation Motors, Air Conditioning etc.). Power needed within 50' of SR Service Truss. Minimum service to safely operate the show is 100 Amp, 3-phase. Actual current draw is in the neighborhood of 80 Amps per leg.

## SOUND DEPARTMENT

1.  Our Sound Mixing position is 8' x 12'. The sound mixing position must be near the centerline at the rear of the orchestra section of the house within the seating section or immediately behind the seating section and preferably within sight of the center cluster. Any seats must be removed prior to the beginning of the load-in. The console area provided must be level, with a flat surface. Easy access and egress to sound position by sound operator is necessary throughout the performance. The show cannot be mixed from a closed room or room with a window. Under all circumstances, our production will run and use its own multi-cable to and from the sound position and the stage area. The venue must ensure that the cable run from the FOH to the stage is clear of audience traffic and is NOT run through conduits/pipe/tubes which would pinch, bend or otherwise damage the cables. Due to scheduling, it is preferable to run the cables along the seating of the Orchestra level.

2.  We will require a center cluster truss position for the production. We travel with a truss system and two 1/2 Ton motors for this purpose if house motors/winches are not available in this position. One center cluster truss weighs approximately 1000 lbs including the truss and rigging. If a house truss is permanently mounted (non-removable) in this position please contact the New York office immediately. The house chain motor points must be appropriately spaced in order to rig the production truss. We can accommodate spacing between points (either side of center) of up to 20 feet. If required, any existing house chain, proscenium and delay speakers must be removed. The show will need full access to hang necessary proscenium speakers, delay speakers and video equipment in the theatre.

3.  We carry a complete sound system and insist that our own console, microphones, playback devices and speaker system be used. We reserve the right to use our own speaker system exclusively. If it is determined by our soundmen to be advantageous, we will tie into your house sound and/or paging

4

system with a 600-ohm LINE LEVEL output and use it in addition to our system. We will require full access to all house sound, paging, video and hearing-impaired systems.

4. This production will utilize 40 channels of UHF Wireless Radios, 10 channels of UHF HME Comm. and at least 8 channels of UHF Motorola walkie-talkies. The use of walkie-talkies or other broadcasting devices in the theatre other than those provided by the show is not allowed.

5. A phone line should be made available at the sound console position for the run of the show. This line should be compatible with a modem (not digital in other words) and should have the ability of accessing long distance via a 1-800 number.

6. A functional dressing room paging system is required. This system should allow patching from our systems via a 600-ohm LINE LEVEL input. If the theatre does not have functional paging speakers in all backstage areas (including dressing rooms) please inform the New York office immediately.

7. The production travels with a pair of 24' high sound towers that will be placed on either side of the stage. The footprint of each tower is 40" wide (SL to SR) and 36" deep (up and downstage). These towers, when loaded with speakers and rigging, will each weigh in excess of 2000 lbs. The venue/presenters shall be responsible for ensuring the safety of floor loading as well as the ability of fastening the tower to the building through the proscenium wall and/or with an overhead steel safety cable. Placement of the towers will be at the discretion of the production.

## PROPERTY DEPARTMENT

1. We require a professional upright piano (not a console), on a piano dolly, which must be tuned (A=440) before the first rehearsal in each city and thereafter every week. The piano is for rehearsal purposes only.

2. We require 20 music stands with stand lights and chairs in the orchestra pit for the musicians.

3. Please be certain that there are at least 80 chairs total for use in the dressing rooms, backstage, and in the orchestra pit.

4. We require black carpeting or drape for the front and back walls of the pit, and black or dark grey carpet covering the pit floor.

5. Push brooms, mops, buckets and a vacuum must be available.

6. Two onstage water coolers must be provided, stationed upstage left and upstage right, for the duration of the engagement. Please place an initial order of 30 5-gallon jugs, and we will request to replenish as necessary.

7. The orchestra pit must be clear except for items listed above.

5

Case 2:06-cv-06079-CM    Document 11-2    Filed 08/15/2006    Page 18 of 40

## WARDROBE DEPARTMENT

1.  At least 6 - 15 amp 115 V circuits are required in the wardrobe area.

2.  In the wardrobe area, there must be 6 six- or eight-foot work tables (at least two must be 8 feet) and 10 chairs, 10 rolling racks, and 2 large garbage cans.

3.  ~~Local presenter must provide 2 full size washers and dryers on the premises (or 4 of each, plus hookups for a second), for show-use only. Washers must have individual cycle capabilities and water levels. Dryers must be 220 volts. Coin-operated machines will be at the expense of the theatre. Appliances must be in full running condition on the first day of the load-in.~~    *Stct*

4.  ~~The production travels with 1 washer and 1 dryer. These machines will require appropriate electrical and water hook up adjacent to the in-house washers and dryers, should it be necessary to use them.~~    *Stct*

5.  Crew Information:  It is imperative that the same people work the load-in, load-out and performances. Of the total personnel, four must be experienced stitchers. Ideally, the composition of the wardrobe crew should be six females and three males. If this is not possible, at least 5 members of the crew must be female.

6.  Crew Calls:  There will be two four-hour work calls each week, on days to be determined by the wardrobe supervisor based on the performance schedule (usually Tuesday and Friday). The wardrobe crew will also be called for a one hour continuity call before the half-hour call before each performance except for the two days on which there is a work call.

7.  ~~A fully-functioning utility sink with hot and cold-running water will be needed for the cleaning and rinsing of costumes and wigs. This sink must be nearby the wardrobe and wig rooms yet separate from any sink used by theatre custodial and cleaning staff.~~    *Stct*

8.  Wardrobe area must be well-lit and well-ventilated.

## HAIR/WIG DEPARTMENT

1.  At least 3 - 20 amp circuits are required in the wig area.

2.  The wig area must be well-lit.

3.  In wig area, there must be 1 six- or eight-foot work table with 1 - lighted mirror space, 1 height-adjustable chair, and 1 - trash can.

4.  ~~A deep sink with hot and cold running water (see Wardrobe Department #7) is required.~~    *Stct*

5.  Crew Information:  It is imperative that the same person works all of the performances. The hair crew member will be called from half-hour through the end of the performance.

6

12/20/2005   02:20    9092444354          EVENSON                          PAGE   23

01/26/2006   23:37    9098858672          THEATRICAL ARTS                  PAGE   23/26

# ORCHESTRA REQUIREMENTS

This production's orchestra is self-contained, and will use the orchestra pit. See Props requirements for chair and stand needs.

The conductor for Mamma Mia plays keyboards and conducts form a seated position. ~~The podium~~ space requirements are slightly larger than usual. This production travels a platform ~~which is 58"~~ (4'10") square and can be raised to a maximum height of 43" (3'7"). ~~The keyboard, stand, music~~ stands, conductor's chair and Pit Mix (for monitoring) all fit on this platform. The conductor must be able to see the deck from a seated position behind the keyboard and have access to all equipment mentioned above. ~~There~~ must be enough space between the edge of the stage and the pit wall behind ~~the conductor,~~ to accommodate necessary adjustments to our traveling podium.

# DRESSING ROOM REQUIREMENTS

1.   Our company consists of 30 performers, 1 conductor, 8 traveling musicians, 3 stage managers, 2 company managers, and a crew of 14 (including 2 wardrobe and 1 hair person).

2.   The dressing room requirements are as follows:

        8  -   Principal (1 person) Dressing Rooms
        2  -   2 person Rooms
        2  -   Large Chorus (12 people) Rooms
        1  -   Conductor Dressing Room
        2  -   Band Room (accommodating up to 6)

3.   All performers' dressing rooms must be cleaned - floors, make-up tables, mirrors, sinks and bathrooms - prior to the START of the load-in and maintained daily. These rooms must be well-lighted with burned out bulbs replaced daily. They must have hot and cold running water, wardrobe racks, etc. in accordance with Actors' Equity Association requirements. Chairs, not stools or benches, are required at each space to be used by a performer.

4.   Additionally, we will need the following rooms for staff personnel, which can be securely locked. Please provide keys to Stage Managers upon arrival.

        1    Room for Company Management with 2 private telephone lines and 1 private line for a fax, with no rollover features. For the fax, we prefer to have direct-dial long distance (not an in-house switchboard), in order to program autodial numbers into the machine. We will use a long distance calling card for this purpose.

        1    Room for Stage Management with 2 private telephone lines (one must be suitable for fax machine hook-up.)

        1    Room for Wardrobe Department (see Wardrobe Requirements)

        1    Room for Hair/Wigs Department (see Hair/Wigs Requirements)

7

12/20/2005  02:20     9092444354          EVENSON                    PAGE  24

01/26/2006  23:37     9899858672          THEATRICAL ARTS            PAGE  24/26

## SECURITY INFORMATION

We require security personnel for each performance to arrive at the theatre 90 minutes before each performance and remain at the theatre until the last company member has departed. Throughout the engagement, all areas used by the company must be secured to the satisfaction of the company's representative. In addition, the stage door must be accessible for any scheduled work calls and/or rehearsals.

## MANAGEMENT REQUIREMENTS

Please mail the following to Nina Lannan Associates, 1450 Broadway, Suite 2011, New York, New York, 10018, as soon as possible:

* List of the theatre personnel and presenting organization's personnel with their private office numbers and home phone numbers if possible.
* List of local doctors to include general practitioner, ear, nose and throat, chiropractor, podiatrist, dentist and OB/GYN, and appropriate hospital or medical center for emergency treatment; as well as a listing of local transportation, laundry facilities, drug store, grocery stores, health clubs, post offices, and nearby restaurants and hotels.
* A copy of the house seating plan which includes all seating areas.

## ESTIMATED LOCAL CREW REQUIREMENTS

The following is an estimate of the number of local stagehands needed and approximate call times. Actual number of personnel may vary depending on local circumstances. These call times may increase or decrease and a final determination of personnel and call times will be made by the Head Carpenter.

### PRE-ENGAGEMENT SPOTTING CALL

| 8 hour call | 1 | Head Carpenter |
| | 13 | Carpenters (5 riggers: 4 up, 1 down) |
| | 1 | Head Electrician (if necessary for tie-ins) |
| | 1 | Head Props (only if required by local conditions) |
| | 6 | Sound |

### LOAD IN (Yellow Card)

Our typical Load-in call is 13 hours spread over 2 days as follows:

| Monday evening | 5 hours |
| Tuesday | 8 hours |

The estimated Load-out call is 5 hours. Load-out will begin at the closest hour following the final performance. This is also the minimum call and is subject to local conditions.

| | IN | RUN | OUT |
|---|---|---|---|
| Carpentry | 8 | 5 | 14 |
| Electrics | 8 | 9* | 8 |
| Sound | 4 | 1 | 8 |
| Props | 2 | 2 | 6 |
| Wardrobe | 9 | 2 | 6 |
| Hair | 1 | 9 | 9 |
| Loaders | AS NEEDED | 1 | 1 |

8

12/20/2005  02:20    9092444364                    EVENSON                              PAGE   25

01/26/2005  23:37    9098858672              THEATRICAL ARTS                        PAGE   25/26

Pushers                    AS NEEDED

*If local conditions do not allow the house electrician to perform deck cues, the number of
local electricians will be raised to 4.

## WORK CALLS

Any stage crew work calls will be scheduled as necessary, with advance notification.

## TRUNK PICKUP & DELIVERY

Approximately 45 large personal trunks are transported with the production, and these need to be
dropped off at one or more hotels during the Tuesday load-in. A truck with lift gate should be made
available (a 22' rental truck is adequate for this purpose), and our road Props Supervisor will advise in
advance any additional labor needs and furnish delivery information. On our final performance day, a
truck will again be needed, to collect trunks from the hotel(s) and return to the theatre for loading.

## CATERING

LOAD-IN: The local presenter must arrange to provide lunch (hot or cold sandwiches and assorted
beverages) for local and touring sound crew during the Tuesday load-in. This may be ordered from
a local takeout restaurant or deli (menu choices are appreciated), for delivery to the stage door at
noon. If the theatre has an exclusive catering agreement, then the house caterer should be given this
information.

LOAD-OUT: In most theatres, our crew and all local stagehands assigned to the load-out will require
a catered hot meal if the load-out is scheduled to go beyond five hours. This catered hot meal will
need to be catered at split shifts:  5 hours after final curtain and 5.5 hours after final curtain. The
load-out catering will be for approximately 55-60 people and should not be breakfast. Please confirm
with the head carpenter to see if a meal is required.

MATINEE DAYS: In addition, catered meals (no pizza, but must be hot meal — no deli and snack
trays) will generally be necessary between shows on 2-performance days, when the scheduled
performance start times are less than 5 and ½ hours apart, or as dictated by local union
conditions. Meals are for up to a total of 40 stagehands, road crew, and wardrobe, however, this is an
estimated number, which may increase or decrease as determined by performance schedules and
union regulations.

## HOUSE MANAGEMENT

1.  Running times are: Act  I – 1:04 and Act II – 1:06.  We prefer 20-minute intermissions. House
    management will be advised by our Stage Managers of the seating hold policy, and should instruct the
    usher staff accordingly.

2.  In the event of a change in cast, it will be necessary for the ushers to place printed announcements in
    each house program at no additional expense to producer. The production stage managers will supply
    these pre-printed announcements to the house 80 minutes before scheduled curtain.

## PRESENTER AVAILABILITY

The Presenter or a representative must be available at all times to the Road Carpenter and the
Production Stage Manager from one hour prior to the load-in to the end of the final performance.
This person must be able to make decisions on behalf of the Presenter.

9

## SUMMARY OF MATERIALS TO BE MAILED TO THE NEW YORK OFFICE

- Union Contracts with prevailing rates
- Hanging plot (line set positions)
- Ground plan and section in scale of stage dimensions and dressing room layout
- The location, size, and access of the loading door
- Local electric restrictions and codes
- Parking availability/accessibility at the theatre, for rental cars of managers and crew.
- Names & phone numbers of Carpenter/Tech Director, Electrician, Theatre Manager, Concessions/Souvenir Manager, Presenter Contact
- House seating plan
- Doctor and local orientation list

In the event that the minimum technical and production requirements of this rider are not met, additional equipment and personnel not specified in this rider may be required.

If there is any further information you require, or if you anticipate any difficulty in meeting the needs as stated above, please contact:

Nina Lannan Associates
Devin Kendell
1450 Broadway, Suite 2011
New York, NY 10018
(212) 221-1122 (phone)
(212) 221-3222 (fax)

Tour Personnel – (reachable through the Management office if no number is listed):

| Position | Name | Contact |
|---|---|---|
| General Manager: | Nina Lannan & Devin Kendell | dkendell@nlannan.com |
| Stage Manager: | Glynn Turner | 347-423-8090 |
| Head Carpenter: | Herb Woodruff | 612-743-6709 |
| Head Electrician: | Todd Davis | 917-554-5586 |
| Head Sound: | Richard Camuso | 954-294-4108 |
| Head Props: | Byron Reynolds | 954-914-6407 |
| Wardrobe Supervisor: | Sandy Haskon-Cuseler | 702-595-9024 |
| Company Manager: | Robert Tetyew | bobtetyew@aol.com |

10

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

| | |
|---|---|
| *MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box. There is no additional administrative fee for this service.* | ☐ |

| Name of Respondent<br>Theatrical Arts Int'l, Inc.& Theatrical Arts Int'l Foundation | Name of Representative (if known)<br>John G. Burgee, Esq. |
|---|---|
| Address<br>c/o Harmony Artists, Inc., 8455 Beverly Blvd., #400 | Name of Firm (if applicable)<br>Burgee & Abramoff, P.C. |
| and see attached service list | Representative's Address<br>20501 Ventura Blvd., Suite 262 |

| City<br>Los Angeles | State<br>CA | Zip Code<br>90048- | City<br>Woodland Hills | State<br>CA | Zip Code<br>91364- |
|---|---|---|---|---|---|
| Phone No.<br>909-885-5152 | | Fax No.<br>909-885-8672 | Phone No.<br>818-264-7575 | | Fax No.<br>818-264-7576 |
| Email Address:<br>acrane-ross@harmonyartists.com | | | Email Address: | | |

The named claimant, a party to an arbitration agreement dated **as of December 23, 2005**_____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

Respondents breached agreement for presentation of musical "Mamma Mia!" by selling tickets at less than the agreed prices. See attached Statement of Claims for fuller statement of nature of the dispute.

| Dollar Amount of Claim $103,719.05 | Other Relief Sought: ☒ Attorneys Fees    ☒ Interest<br>☒ Arbitration Costs ☐ Punitive/ Exemplary ☒ Other accounting |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $1,800.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Knowledgeable about professional theatrical production agreements.

Hearing locale Manhattan, New York, NY    (check one) ☐ Requested by Claimant  ☒ Locale provision included in the contract

| Estimated time needed for hearings overall:<br>_____ hours or  1  _____ days | Type of Business:  Claimant _ Theatrical Producer<br>Respondent Theatrical Presenter |
|---|---|

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA  ☐ Dallas, TX   ☐ East Providence, RI
☐ Fresno, CA  ☒ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)  Date: 6/27/06 | Name of Representative<br>Al J. Daniel, Jr., Esq. |
|---|---|
| Name of Claimant<br>The Mamma Mia! USA Tour 2 Limited Partnership | Name of Firm (if applicable)<br>Cowan, DeBaets, Abrahams & Sheppard LLP |
| Address (to be used in connection with this case)<br>c/o The Booking Group, 145 West 45th Street, 8th Floor | Representative's Address<br>41 Madison Avenue, 34th Floor |

| City<br>New York | State<br>NY | Zip Code<br>10036- | City<br>New York | State<br>NY | Zip Code<br>10010- |
|---|---|---|---|---|---|
| Phone No.<br>212-869-9280 | | Fax No.<br>212-869-3028 | Phone No.<br>212-974-7474 | | Fax No.<br>212-974-8474 |
| Email Address:<br>mblair@thebookinggroup.com | | | Email Address:<br>adaniel@cdas.com | | |

To begin procedures, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.   AAA Customer Service can be reached at 800-778-7879

AMERICAN ARBITRATION ASSOCIATION

THE MAMMA MIA! USA TOUR 2 LIMITED PARTNERSHIP, Claimant
    vs.
THEATRICAL ARTS INTERNATIONAL, INC. and
THEATRICAL ARTS INTERNATIONAL FOUNDATION, Respondents.

## DEMAND FOR ARBITRATION

### SERVICE LIST

1.    THEATRICAL ARTS INTERNATIONAL, INC. and
    THEATRICAL ARTS INTERNATIONAL FOUNDATION
    c/o Harmony Artists, Inc.
    8455 Beverly Blvd., #400
    Los Angeles, CA 90048

2.    Robert Abramoff, Esq.
    20501 Ventura Blvd., #262
    Woodland Hills, CA 91364
    Respondents' Agent for Service of Process,
    as registered with California Secretary of State

3.    John G. Burgee, Esq.
    20501 Ventura Blvd., #262
    Woodland Hills, CA 91364
    Respondents' Representative

**JOHN G. BURGEE, ESQ. (State Bar No. 132129)**
**BURGEE & ABRAMOFF, P. C.**
20501 Ventura Boulevard, Suite 262
Woodland Hills, California 91364
(818) 264-7575

Attorneys for Plaintiff
THEATRICAL ARTS INTERNATIONAL, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN BERNARDINO

THEATRICAL ARTS INTERNATIONAL, INC.,
a California corporation,
            Plaintiff(s),

Index No. SCVSS 138221

-against-

**AFFIDAVIT OF SERVICE**

THE MAMMA MIA! USA TOUR 2 LIMITED
PARTNERSHIP, a New York limited
partnership, and DOES 1 through 50 inclusive,
            Defendant(s).

STATE OF NEW YORK  )
                  S.S.:
COUNTY OF NEW YORK)

       **OTIS OSBORNE**, being duly sworn, deposes and says:

       I am not a party to the action, am over 18 years of age, and am employed by the attorney service, DLS, INC.

       That on the 2nd day of August 2006, at approximately 11:49 a.m., deponent served a true copy of the **SUMMONS AND COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTION RELIEF** upon The Mamma Mia! USA Tour 2 Limited Partnership c/o Nina Lannan Associates at 1450 Broadway, Suite 2011, New York, NY 10018, by personally delivering and leaving the same with Roseanna Sharrow, G M Associate, who informed deponent that she is an agent authorized by appointment to receive service at that address.

       Roseanna Sharrow is a white female, approximately 32 years of age, stands approximately 5 feet 8 inches tall, and weighs approximately 180 pounds with brown hair and blue eyes.

_____
OTIS OSBORNE #870139

Sworn to before me this
4th day of August, 2006

_____
NOTARY PUBLIC

$D$

# COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP

### ATTORNEYS AT LAW

41 MADISON AVENUE, NEW YORK, NEW YORK 10010
TEL: 212-974-7474   FAX: 212-974-8474

## Facsimile Transmission Cover Sheet

TO:
John G. Burgee, Esq.

FROM:
Al J. Daniel, Jr., Esq.
adaniel@cdas.com

FAX NUMBER:
818-264-7576

DATE:
8/3/06

COMPANY:
Burgee & Abramoff, P.C.

TOTAL NO. OF PAGES INCLUDING COVER:
31

PHONE NUMBER:

SENDER'S REFERENCE NUMBER:

RE:
Mamma Mia! USA Tour 2 LP v.
Theatrical Arts, Index No. 602724/06
(S. Ct. N.Y. Co.)

CC:

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Dear Mr. Burgee:

I am sending you courtesy copies of the following documents in the above case filed this afternoon: Verified Petition to Compel Arbitration & Enjoin Respondents from Litigation (w/o exhibits, all or most of which you have); Memorandum of Law in Support of Petition; Emergency Affirmation; and proposed Order to Show Cause. A full set of papers will be served in due course.

I will make an application for the preliminary relief sought in the proposed Order to Show Cause before a judge in the Commercial Division of the Supreme Court of the State of New York, New York County, tomorrow at 11:00 a.m., August 4, 2006, at 60 Centre Street, New York, New York. I will first go to the Commercial Division Clerk's office in Room 300 where I will be directed to the judge assigned to the case.

I was advised to give you notice of this application so that Respondents may appear in response if they so wish.

Sincerely yours,

Al J. Daniel, Jr.

### CONFIDENTIALITY NOTICE

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

EXHIBIT "E"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

Application of                                    :

THE MAMMA MIA! USA TOUR 2                         :        Index No. 602724/06
LIMITED PARTNERSHIP, a New York                   :
Limited Partnership,                              :

                        Petitioner,               :
                                                  :
                                                  :
Pursuant to NY CPLR § 7503 and                    :        VERIFIED PETITION TO
The United States Arbitration Act, 9 U.S.C. § 1 et seq.    :    COMPEL ARBITRATION
For An Order and Judgment Compelling Respondents  :        & ENJOIN RESPONDENTS
To Arbitrate and Enjoining Respondents From       :        FROM LITIGATION
Pursuing A Civil Action,                          :
                                                  :        RECEIVED AND TO BE FILED
                                                  :        NOT YET APPEARED
      -against-                                   :
                                                  :        AUG 3 2006
THEATRICAL ARTS INTERNATIONAL, INC. and           :
THEATRICAL ARTS INTERNATIONAL                     :
FOUNDATION, California corporations,              :        COUNTY CLERKS OFFICE
                                                  :        NEW YORK
                        Respondents.              :
-----------------------------------------------------------------x

Petitioner Mamma Mia! USA Tour 2 Limited Partnership ("Mamma Mia!"), through

counsel, petitions the Court, pursuant New York Civil Practice Law and Rules ("CPLR") §§ 401

et seq. and 7501 et seq., and the United States Arbitration Act, 9 U.S.C. §§ 1 et seq., to compel

respondents to arbitrate a claim for lost ticket revenues of approximately $103,719.05 in

connection with a road show production of the musical "Mamma Mia!" in accordance with a

written arbitration agreement and to enjoin respondent Theatrical Arts International, Inc. from

proceeding with a civil action commenced by it against Petitioner in a California state court on

May 31, 2006 -- but not purportedly served upon Petitioner until August 2, 2006 -- which seeks

to enjoin Petitioner from proceeding with arbitration and a determination on the merits of the

parties' dispute, contrary to their arbitration agreement, for the following reasons:

### Jurisdiction

1.    This case concerns a contract and transaction involving interstate commerce and a written agreement to arbitrate any disputes, which are subject to the terms and obligations of the United States Arbitration Act, 9 U.S.C. §§ 1, 2, and 4. This Court has jurisdiction under CPLR §§ 302(a), 7501, 7502, and 7503 because Respondents transacted business with Petitioner in the state and signed an arbitration agreement providing for arbitration of the parties' disputes in Manhattan, New York.

### The Parties

2.    Claimant Mamma Mia! USA Tour 2 Limited Partnership, a/k/a Mamma Mia! USA Tour 2, LP ("Mamma Mia!") is a New York limited partnership, with its principal place of business in New York City, New York, whose partners are citizens of the states of New York and Delaware and are subjects of the foreign states of Sweden, the United Kingdom, Panama, and Canada. Mamma Mia! is the producer of a road show production of the popular musical "Mamma Mia!" (the "Show") which has been running on Broadway in New York City since October 2001, as well in various other cities, after it was originally presented in London, England. Petitioner has presented the "Mamma Mia!" show in approximately seventy-five (75) different cities in various states throughout the United States.

3.    Respondent Theatrical Arts International, Inc., a California corporation, and/or Theatrical Arts International Foundation, a California corporation (collectively "Theatrical Arts") are presenters of theatrical productions at the California Theatre in San Bernadino, California (the "Theatre"), where their principal places of business are located. Respondents executed the Booking Agreement at issue as "Theatrical Arts International" without distinguishing between the two entities.

- 2 -

## Agreement of the Parties-Including Written Arbitration Agreement

4.      Beginning in our around June 2003, Mamma Mia! and Theatrical Arts, through their respective booking agents The Booking Group and Harmony Artists, Inc., engaged in periodic negotiations for Theatrical Arts to present a one-week run of the Show at the Theatre. All dealings between the parties described herein were through their respective booking agents, unless otherwise stated.

5.      In negotiations with Respondents, Mamma Mia! insisted that its ticket prices were non-negotiable and that Theatrical Arts could not sell tickets for the Show at discounts, except as expressly agreed upon by Mamma Mia!, and advised Theatrical Arts that a competitor was interested in the Show. Theatrical Arts urged Mamma Mia! not to enter an agreement with the competitor and agreed to the ticket prices required by Mamma Mia!

6.      In or about September 2005, the parties agreed on the principal terms for presentation of the Show in the Theatre in February 2006, including the ticket prices required by Mamma Mia!, based upon an exchange of emails and other communications.

7.      On or about December 23, 2005, Mamma Mia! discovered that Theatrical Arts was already selling some tickets for the Show at prices below those specified by Mamma Mia! and previously agreed by Theatrical Arts. Mamma Mia! reluctantly agreed in January 2006 that Theatrical Arts could continue to sell tickets at those lower prices.

8.      On or about January 11, 2006, Mamma Mia! sent Theatrical Arts three execution copies of a Booking Agreement dated as of December 23, 2006, including Exhibit A, which set forth the agreed terms and conditions, including ticket prices, upon which Theatrical Arts was granted permission to present the Show at the Theatre during February 21-26, 2006 (the "Booking Agreement"), along with a document transfer sheet of instructions. True and correct

- 3 -

copies of the foregoing Booking Agreement and document transfer sheet are attached as Exhibit
1.

9.      The Booking Agreement provides for resolution of any disputes by arbitration. In
pertinent part, the Booking Agreement, ¶ 17, provides that "[a]ny claims, dispute, or controversy
arising out of or relating to this [booking] agreement shall be submitted to arbitration in
Manhattan, New York before one arbitrator pursuant to the rules then applicable of the American
Arbitration Association ..." and that "the prevailing party in the arbitration being entitled to all
costs including reasonable attorney's fees."

10.     On or about February 7, 2006, Theatrical Arts' president Joseph Henson signed
the Booking Agreement and returned it to Mamma Mia! by facsimile transmission, after making
unauthorized interlineated changes to the Booking Agreement, including the addition of
discounted ticket prices on Schedule A. Theatrical Arts made no changes to the arbitration
provision in ¶ 17 of the Booking Agreement. A true and correct copy of the Booking Agreement
as signed by Theatrical Arts is attached as Exhibit 2.

11.     On February 8, 2006, Mamma Mia! (through its booking agent) sent an email to
Theatrical Arts' booking agent objecting to its unauthorized changes to the Booking Agreement,
including discount ticket prices, contrary to the parties' prior agreement. A true and correct copy
of this email is attached as Exhibit 3.

12.     On or about February 16, 2006, Mamma Mia!'s General Manager signed the
Booking Agreement, after modifying the unauthorized changes by Theatrical Arts it to reflect the
prior agreement of the parties, including omission of discounted ticket prices. A true and correct
copy of the Booking Agreement as executed by Mamma Mia! is attached as Exhibit 4 hereto.
Mamma Mia! made no changes to the arbitration provision in ¶ 17 of the Booking Agreement.

- 4 -

13.     Mamma Mia!'s Company Manager Bob Tevyaw reviewed and discussed the

fully-executed Booking Agreement with Theatrical Arts on or about February 21, 2006 or soon

thereafter.

### Mamma Mia! Presented the Show at Respondents' Theatre

14.     Theatrical Arts presented the Show at the Theatre between February 21-26, 2006.

A true copy of the program for the Show at the Theatre is attached as Exhibit 5.

15.     On or about February 21, 2006, Theatrical Arts paid Mamma Mia! $367,500 for

the guaranteed minimum fee of $375,000 (less withheld taxes) for Mamma Mia!'s presentation

of the Show at the Theatre from February 21-26, 2006.

### Arbitrable Dispute Under the Agreement

16.     Under ¶ 4(A)(2) of the Booking Agreement, Theatrical Arts agreed to pay

Mamma Mia! eighty percent (80%) of box office receipts, as defined in the agreement, based

upon the agreed ticket prices.

17.     On February 22, 2006, Mamma Mia! notified Theatrical Arts that it had violated

the parties' agreement by discounting tickets without authorization and possibly by issuing

unauthorized complimentary tickets.

18.     Theatrical Arts responded that no additional sums were due to Mamma Mia!

beyond the guaranteed minimum paid, despite the fact that Theatrical Arts sold numerous tickets

to the Show at discounted prices, contrary to the parties' agreement.

19.     Mamma Mia! claims that Theatrical Arts' sale of tickets for the Show at prices

below those authorized by Mamma Mia! and agreed to by Theatrical Arts was in breach of the

parties' contract and the Booking Agreement.

- 5 -

20.    Mamma Mia! determined that it suffered damages from lost ticket revenues as a direct and proximate result of Theatrical Arts' breach of the parties' contract and the Booking Agreement in an amount not less than $103,719.05, after giving Theatrical Arts credit of $4,820.95 for certain expenses reimbursable under the Booking Agreement. Theatrical Arts denied Mamma Mia!'s claim.

21.    Between the beginning of March and the end of May 2006, counsel for the parties exchanged correspondence in an attempt to resolve their dispute, but were unable to do so.

### Mamma Mia!'s Demand for Arbitration

22.    On June 27, 2006, Mamma Mia! served Theatrical Arts with a Demand for Arbitration before the American Arbitration Association, pursuant to ¶ 17 of the Booking Agreement, and filed it with the AAA, with a cover letter dated June 27, 2006 to the AAA Vice President - Case Management Center. A true copy of the Demand for Arbitration and cover letter are attached as Exhibit 6.

23.    On July 6, 2006, the AAA acknowledge receipt of Mamma Mia!'s Demand for Arbitration, assigned it AAA Case No. 13 459 01 484 06, and advised that it would administer the demand under AAA's commercial arbitration rules.

### Theatrical Arts Repudiates Its Obligation to Arbitrate

24.    Theatrical Arts has not filed a response to Mamma Mia!'s Demand for Arbitration, which AAA rules deem a denial of the demand. AAA Commercial Arbitration Rule 4(c).

25.    On July 21, 2006, the AAA Case Manager held a telephone conference to discuss AAA procedures for the arbitration with undersigned counsel for Mamma Mia! and John G. Burgee, Esq., counsel for Theatrical Arts.

- 6 -

26.     During the foregoing telephone conference, Theatrical Arts' counsel advised the

AAA Case Manager that Theatrical Arts denied that it was obligated to arbitrate Mamma Mia!'s

claim and advised that Theatrical Arts had commenced a civil action in state court in California

seeking to enjoin Mamma Mia! from proceeding with its arbitration claim.

### Theatrical Arts' Previously Undisclosed and Unserved California Complaint

27.     Research by Mamma Mia!'s undersigned counsel revealed that Theatrical Arts

filed a civil action captioned Theatrical Arts International, Inc. v. The Mamma Mia! USA Tour 2

Limited Partnership and DOES 1 through 50 in the Superior Court of the State of California for

the County of San Bernardino on May 31, 2006, which was assigned Case No. SCVSS 138221

("Theatrical Arts' Suit"). A true and correct copy of the Summons and Complaint in Theatrical

Art's Suit is attached as Exhibit 7, including the Order Confirmation and related documents from

One Legal, Inc., the attorney service company which sent Mamma Mia!'s counsel a copy of the

Summons and Complaint it obtained from the California court.

28.     Theatrical Arts' Suit admits that Marnma Mia! presented the Show at the Theatre

in February 2006, but claims that it does not owe any additional sums and asserts that it has no

obligation to arbitrate Mamma Mia!'s claims, despite the fact that the parties signed the Booking

Agreement without making any changes to ¶ 17 which provides for arbitration of any disputes,

regardless of whether the parties may have disputes as to other terms of their agreement, which

present issues for determination by the arbitrator alone.

29.     Theatrical Arts' Suit seeks a declaratory judgment "as to the terms of the parties'

relationship" and to the effect that Theatrical Arts does not owe Mamma Mia! any additional

compensation for the presentation of the Show at the Theatre in February 2006. Exhibit 7, p. 4.

30.     Theatrical Arts' Suit also seeks a temporary restraining order and a preliminary and permanent injunction "enjoining [Mamma Mia! and DOES] from initiation [sic], prosecuting, pursuing or continuing any arbitration pursuant to the purported written contract …." Exhibit 7, p. 4.

31.     Theatrical Arts filed its suit against Mamma Mia! on May 31, 2006, the day after its attorney had written to Mamma Mia!'s counsel Andrew Farber, Esq. regarding the parties' dispute and suggesting mediation as a means of resolving it.

32.     On August 2, 2006, Theatrical Arts purportedly served the Summons and Complaint in Theatrical Art's Suit upon Mamma Mia!'s General Manager, despite the fact that it was filed on May 31, 2006.

33.     Neither Mamma Mia! nor its counsel had been informed that Theatrical Arts had filed its action in the Superior Court of California prior to the telephone conference with the AAA Case Manager on July 21, 2006.

### Theatrical Arts Should Be Ordered to Arbitration

34.     Theatrical Arts agreed in writing in ¶ 17 of the Booking Agreement to arbitrate disputes that might arise from Mamma Mia! performances of the Show at the Theatre in February 2006, but has asserted that it is not obligated to arbitrate Mamma Mia!'s dispute and filed its suit in California to prevent arbitration.

35.     Pursuant to CPLR § 7503(a) (see Section 4 of the United States Arbitration Act, 9 U.S.C. § 4), the Court should order Theatrical Arts to proceed with the arbitration commenced by Mamma Mia! before the AAA, as provided in ¶ 17 of the Booking Agreement.

- 8 -

## Theatrical Arts Should Be Enjoined From Pursuing Its California Suit

36.    Theatrical Arts has ignored its agreement to arbitration as the sole remedy for disputes between the parties and has improperly commenced its California suit in an attempt to interfere with and delay the arbitration and improperly adjudicate the merits of the dispute between the parties.

37.    Pursuant to CPLR § 7502(c) (see Section 4 of United States Arbitration Act) and other applicable law, the Court should enjoin Theatrical Arts from proceeding with its California suit or commencing any other action against Mamma Mia! concerning the Booking Agreement in any respect.

38.    An injunction under CPLR §7502(c) is necessary because Petitioner's right to arbitrate the parties' dispute may otherwise be rendered ineffectual if Theatrical Arts proceeds with its civil action in California state court, where it asserts that it has no obligation to arbitrate and asks the court to determine the parties' dispute on the merits, contrary to Petitioner's right to arbitrate its claims, as provided in ¶ 17 of the Booking Agreement.

**WHEREFORE**, petitioner Mamma Mia! respectfully requests that the Court issue an order as follows: (1) directing Theatrical Arts to proceed to arbitration forthwith; (2) enjoining Theatrical Arts from proceeding with its California suit against Mamma Mia! or commencing any other action concerning the disputes covered by the parties' arbitration agreement; (3) awarding Petitioner its costs, including reasonable attorney's fees as allowed by contract or law; and (4) granting such other or further relief as the Court deems necessary and appropriate under the circumstances.

- 9 -

Dated:      August 2, 2006
              New York, New York

                                   COWAN, DeBAETS, ABRAHAMS
                                     & SHEPPARD LLP

                              By _____
                                  Al J. Daniel, Jr.
                                 41 Madison Avenue, 34th Floor
                                 New York, New York 10010
                                 (212) 974-7474
                                 Attorneys for Petitioner
                                 Mamma Mia! USA Tour 2 Limited Partnership

## VERIFICATION

STATE OF NEW YORK )
                  )  ss.:
COUNTY OF NEW YORK )

    **DEVIN KEUDELL**, being duly sworn, states:

    I am the General Manager of the Petitioner Mamma Mia! USA Tour 2 Limited

Partnership ("Mamma Mia!"), a New York limited partnership. I have read the foregoing

Verified Petition. The allegations therein are true based upon my personal knowledge, except as

to allegations made upon information and belief, and as to those allegations, I believe them to be

true based upon information in our files and those of The Booking Group, Inc., the booking

agent for Mamma Mia! in connection with the issues in this case, my experience in the theatrical

industry, and information provided by Mamma Mia!'s counsel.

Dated:    August 2, 2006
          New York, New York

                                  Devin Keudell

Sworn to before me
this 2 th day of August, 2006.

Notary Public

AMY BETH JACOBS
Notary Public, State of New York
No. 01JA6085729
Qualified in Kings County
Commission Expires December 30, 2006



At the Commercial Division, Part ___ of the
Supreme Court of the State of New York,
held in and for the County of
New York, located at 60 Centre Street, 019421
New York, New York, at the
Courthouse in the City and State
of New York, this ~4th~ day of
August, 2006,

PRESENT:

Hon. *C. E. Ramos* ,
                Justice

# ORIGINAL

MOTION SEQUENCE #001

-----------------------------------------------------------------x

Application of

THE MAMMA MIA! USA TOUR 2
LIMITED PARTNERSHIP, a New York
Limited Partnership,

                            Petitioner,

Pursuant to NY CPLR § 7503 and
The United States Arbitration Act, 9 U.S.C. § 1 et seq.
For An Order and Judgment Compelling Respondents
To Arbitrate and Enjoining Respondents From
Pursuing A Civil Action,

                            -against-

THEATRICAL ARTS INTERNATIONAL, INC. and
THEATRICAL ARTS INTERNATIONAL
FOUNDATION, California corporations,

                            Respondents.

-----------------------------------------------------------------x

Index No. 602724/06

## ORDER TO SHOW CAUSE

VAL 3

INDEX NUMBER 602724  YEAR 2006
6 RJI FEE              95.00
15 MOTIONS            45.00
TOTAL                140.00
CHECK                 95.00
CASH                  45.00
--------------------------------
CONS CASHIER    DATE    TIME  TERM
30397 1000  06 AUG 03  3:43 PM 60-3

Upon reading and filing of the annexed Verified Petition to Compel Arbitration and

Enjoin Litigation dated August 2, 2006, with exhibits annexed, the Emergency Affirmation of Al

J. Daniel, Jr., Esq. dated August 3, 2006, and the accompanying Memorandum of Law in

Support of Petition to Compel Arbitration and Enjoin Litigation, seeking to compel Respondents

to arbitrate Petitioner's Demand for Arbitration served upon them and filed with the American

F

Arbitration Association on June 27, 2006, pursuant to ¶ 17 of the Booking Agreement signed by

the parties, and to enjoin Respondents from maintaining or continuing a civil action commenced

by Respondent Theatrical Arts International, Inc. against Petitioner regarding the same subject

matter, which action was purportedly served upon Petitioner on August 2, 2006,

LET Respondents, or their attorneys, show cause at the Commercial Division, Room 238

of the Supreme Court of the State of New York, County of New York, at 60 Centre Street, New

York, New York, on the _10th_ day of August 2006, at 9:30 o'clock in the forenoon of that day, or

as soon thereafter as counsel may be heard, why an order and judgment should not be made and
_for the relief sought in the petition_

entered, pursuant to New York Civil Practice Law and Rules § 7503, and the United States

Arbitration Act, 9 U.S.C. ¶ 1 et seq. compelling Respondents to arbitrate Petitioner's Demand for

Arbitration now pending before the American Arbitration Association pursuant to ¶ 17 of the
_and enjoining Respondents from maintaining or continuing_
parties' Booking Agreement; and it is further _any civil action against Petitioner_
_for regarding the same subject_
~~ORDERED that, pending the hearing and determination of this petition, respondents~~ _matter._

~~shall continue to participate in proceedings before the American Arbitration Association~~

~~Petitioner's Demand for Arbitration, subject to their contentions that they are not obligated to do~~

~~so; and it is further~~

~~ORDERED that, pending the hearing and determination of this petition, Respondents are~~

~~preliminarily restrained from maintaining or continuing any civil action regarding the subject~~

~~matter and disputes asserted in Petitioner's Demand for Arbitration; and it is further~~

ORDERED that personal service of a copy of this Order to Show Cause, together with

copies of the papers upon which it is based upon Respondents Theatrical Arts International, Inc.

and Theatrical Arts International Foundation, c/o their registered agent for service of process,

Robert Abramoff, 20501 Ventura Blvd. #262, Woodland Hills, California 91364, or upon their

2

legal counsel, John G. Burgee, Esq., Burgee & Abramoff, P.C., 20501 Ventura Boulevard, Suite 262, Woodland Hills, California 91364, in hand, by facsimile, or by electronic transmission, on or before the ___4th___ day of August, 2006, shall be deemed good and sufficient service; and it is further

**ORDERED** that answering papers, if any, shall be served, by hand, by fax to 212-974-8474, or by electronic delivery of copies thereof in PDF format upon Al J. Daniel, Jr., Esq., adaniel@cdas.com, Cowan, DeBaets, Abrahams & Sheppard LLP, attorneys for Petitioner, no later than 5:00 p.m. on 9th August, 2006.

ENTER:

_____
J.S.C.

ORAL ARGUMENT
DIRECTED
_____
J.S.C.

HON. CHARLES E. RAMOS

2